**SYNERCOM TECHNOLOGY, INC.**

v.

**UNIVERSITY COMPUTING COMPANY and Engineering Dynamics, Inc.**

**Civ. A. Nos. 3–77–0233–G, 77–474–G.**

United States District Court, N. D. Texas, Dallas Division.

Feb. 7, 1979.

D. Arlon Groves, Robin A. Hartman, Bard & Groves, Richard S. Siluk, Alan D. Rosenthal, Baker & Botts, Houston, Tex., for plaintiff.

Stanley R. Moore, Crisman & Moore, Thomas L. Cantrell, Schley & Cantrell, Dallas, Tex., for Engineering Dynamics, Inc.

## MEMORANDUM OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

### Background

This order concerns the only unresolved liability question in this lawsuit, the claim of unfair competition asserted by Synercom Technology, Inc. against University Computing Company (UCC) and Engineering Dynamics, Inc. (EDI). The claims of copyright infringement were decided by this court in a memorandum and order issued August 24, 1978 and reported at 462 F.Supp. 1003 (N.D.Tex.1978). The facts of this lawsuit were there set forth. No useful purpose would be served by reiteration of the facts except those directly relevant to the question of unfair competition.

First, this court found that, in developing new input formats, instruction manuals and related services to provide more simplified access to a computer program for structural analysis (STRAN), Synercom expended "approximately four man years at a cost in the range of $100,000." Moreover, by the time EDI entered the computerized structural analysis market with its SACS II program, Synercom had incurred costs approaching $500,000. Thus "without the cost of developing the input formats or of training customers in their usage, EDI was in position to simply pluck the fruits of Synercom's labors and risks, if SACS II was as good or better than STRAN."

This court found further that EDI's marketing strategy was to make its SACS II program compatible with the STRAN format so that STRAN users could switch to SACS II with minimum expense, and to

capture the market aided in its pricing by lower cost. Additionally, the court found that in 1976, when the relationship between UCC and Synercom was deteriorating, UCC and EDI embarked upon a marketing effort that "if not aimed squarely at the old Synercom accounts included them in its sights." Finally, this court found that EDI and UCC willfully infringed Synercom's copyrights in its User's Manuals and that EDI's original counsel "conducted this litigation in a manner calculated to delay hearing on the merits and to increase the costs of litigation to Synercom as much as possible."

### Analysis

The question for decision is whether EDI and UCC engaged in unfair competition by creating a structural analysis package designed specifically to be adaptable to an input methodology developed at great expense by Synercom and by directing its marketing program in significant part at Synercom's accounts.

The central legal doctrine upon which Synercom premises its claim of unfair competition is the doctrine of misappropriation. That doctrine was born into widespread acceptance in 1918 with the decision of the United States Supreme Court in *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), a case decided under the pre-*Erie* federal common law. In that case the court enjoined I.N.S. from copying from A.P. bulletin boards uncopyrighted news gathered by A.P. correspondents and then selling the stories to I.N.S. member papers. The effect of the decision was not to grant A.P. a monopoly in the news stories gathered by its reporters, but to postpone reproduction and dissemination by I.N.S. until the immediate commercial value of the news was gone. The court emphasized the peculiarly short-lived value of news, and found that A.P. had a "quasi-property" right in freshly gathered news.

From this rather spectacular beginning there emerged a widely accepted action for the business tort of misappropriation, classified by several states under the general heading of unfair competition.[1] The courts of Texas have embraced the doctrine. *See Southwestern Broadcast Co. v. Oil Center Broadcast Co.,* 210 S.W.2d 230 (Tex.Civ. App.—El Paso 1947, writ ref'd n. r. e.); *Gilmore v. Sammons,* 269 S.W. 861 (Tex.Civ. App.—Dallas 1925, writ ref'd). In its typical formulation, the doctrine of misappropriation is said to require proof of three elements: "(i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (*i. e.,* a 'free ride') because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff." Dannay, The Sears-Compco Doctrine Today: Trademarks and Unfair Competition, 67 Trademark Review 132 (1976).

Even casual analysis will reveal, however, that the doctrine's reach cannot be as broad as is indicated by this formulation of elements. Literally applied, for instance, the doctrine as set out would encompass the manufacture by a non-patentee of a product upon which a patent had expired. Obviously, then, the doctrine of misappropriation has limits, both inherent to the doctrine itself and externally imposed by the United States Constitution and the federal patent and copyright laws. The analysis here will proceed upon the assumption that the activity involved in this case is unlawful under the common law doctrine of misappropriation, whatever may be the inherent limits of that doctrine. The initial inquiry, then, will be whether the states, here the State of Texas, may legitimately punish the conduct engaged in by EDI and UCC, or whether Texas is foreclosed from regulating that conduct by federal law. More succinctly, the question, as it is so often in cases of this nature, is one of preemption.

---

1. Strictly speaking, the tort of unfair competition requires the additional element of secondary meaning, or "passing off." As there is no claim that EDI or UCC passed off their product as that of Synercom, the analysis here will focus upon the doctrine of misappropriation.

The starting point for the effort to measure the permissible scope of state regulation of intellectual property is the analysis of the Supreme Court in two cases decided the same day, *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). Both cases involved mechanical devices (a pole-lamp in *Sears* and a lighting fixture in *Compco*) created and patented (both cases involved design patents) by the plaintiff and copied by the defendant. In both cases the lower court had held the design patent invalid but had granted the plaintiffs relief under the state law of unfair competition. The Supreme Court reversed the lower court decisions, finding the state laws preempted under the Supremacy Clause of the Constitution, U.S. Const. Art. VI, the Patent-Copyright Clause, U.S.Const. Art. I, § 8, cl. 8, and the patent and copyright laws enacted by Congress. The court reasoned that one of the essential goals of the patent laws was to ensure that all inventions and discoveries were freely available to the public except those that were found to merit the temporary (17 years) reward of protection from competition by meeting the stringent requirements of patentability. Devices that did not meet those standards, the court reasoned, were intended by Congress to be freely available to the public, and state laws that effectively removed such devices from the public domain conflicted with the Congressional purpose and, consequently, were preempted.

The language of the decisions is broad,[2] giving a wide reading to the preemptive sweep of patent and copyright legislation:

> [W]hen an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in article I, § 8, cl. 8,

of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain. 376 U.S. at 237, 84 S.Ct. at 782.

Despite the broad language of the decisions, it is important to note the precise factual context in which the cases arose. The devices in question were clearly the *type* of things to which the patent laws applied; these devices had simply been found not to meet the requirements of patentability. Thus if state law protection had been accorded to the plaintiffs in these cases, state law would have operated essentially as an extension of the patent system and, in fact, would have effectively subsumed the scheme of patent legislation by granting protection for a presumably unlimited period of time to devices that failed to meet the tests for federal patent protection. Thus the holdings of *Sears* and *Compco* are unremarkable; a contrary holding would have significantly eviscerated the purposes of federal patent legislation.[3]

Nonetheless, were these decisions the last word on the subject of preemption in the patent and copyright fields, this court would be constrained to hold state protection of the activity complained of here preempted, simply because of the broad language of *Sears* and *Compco*. But since those cases the Supreme Court has issued several decisions that have cut back on at least the language of *Sears* and *Compco* and have attempted to fashion some sort of workable interplay between state and federal law in the field of intellectual property. The result of these more recent decisions is that the precise dimensions of the preemptive sweep of federal law, and, consequently, the permissible reach of state law in this area has become a matter of difficulty and confusion that requires careful analysis of each case in the light of the relevant case law. The line between the permissible and

---

2. The breadth of language appears to have been intentional. Indeed, the cases could conceivably have been decided on the basis of a failure to adequately prove secondary meaning, without ever reaching the preemption issue.

3. It is also noteworthy that neither case involved "culpable" conduct on the part of the defendant in the sense that there was no breach of a confidential or contractual relationship and no theft of secrets.

the impermissible exercise of state power has become difficult to discern.

The first significant step back from the sweeping language of *Sears* and *Compco* was taken in *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). Involved in that case was a California penal statute outlawing tape piracy. Goldstein and others who had been convicted under the statute challenged the power of California to punish tape piracy, arguing that state regulation of the activity was preempted by the federal copyright laws. The Supreme Court found, however, that the California law was not preempted and it upheld the convictions, reasoning that Congress, which until 1971 did not legislate with respect to copyright in musical recordings, had not determined that recordings were unworthy of any protection but had simply left the area "unattended." Hence the states were free to regulate with respect to musical recordings.

In a narrow sense, the *Goldstein* decision is as unremarkable as the *Sears* and *Compco* decisions. The case involved a penal statute regulating conduct that might be termed "culpable" in a sense that the conduct involved in *Sears* and *Compco* was not. Thus the statute in question was more an exercise of the state police power than were the laws found preempted in *Sears* and *Compco;* enforcement of the California law could not be said to conflict with the scheme of federal copyright regulation. In a sense, then, the *Goldstein* decision did not appear to work a significant departure from *Sears* and *Compco*.

On the other hand, the tone and language of the *Goldstein* decision altered at least the angle of approach to preemption problems. That is, whereas the court in *Sears* and *Compco* appeared to start with the presumption that intellectual property not specifically given protection by federal law was not a legitimate subject for state law protection, the court in *Goldstein* began with the premise that state regulation is permissible absent a Congressional inten-

tion to occupy the field. Still, the analysis in the three cases is along the same lines. In each case the court's central concern was whether the state law conflicted unacceptably with the goals of federal legislation.

That analysis was further elucidated by the Supreme Court in *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), a decision that represents the most significant departure from *Sears* and *Compco*. The plaintiff in *Kewanee* was a corporation that, after more than a decade of work, had succeeded in growing a valuable 17-inch crystal useful in the detection of ionizing radiation. Several employees, all of whom had signed trade secret agreements, joined the defendant Bicron Corporation, which then succeeded in growing a 17-inch crystal in only nine months. While the trial court permanently enjoined the defendant from making use of the crystal on the basis of Ohio trade secret law, the Sixth Circuit reversed that decision, finding state protection preempted under *Sears* and *Compco*. The Supreme Court, however, reinstated the trial court's decision, finding Ohio's trade secret law not preempted. Before considering the court's analysis, it is important to consider the facts of *Kewanee* and their relation to those in *Sears* and *Compco*.

First, *Kewanee* involved an invention clearly subject to the reach of the patent laws. No patent was applied for because the requirement of novelty could not be satisfied—the crystal had been in commercial use for more than one year prior to its development by the plaintiff. Yet the effect of the court's decision was to permanently prevent its use by the defendant unless the defendant could discover the process through its own independent efforts or through "working backwards" from the plaintiff's product. At least in a temporal sense, then, enforcement of the Ohio trade secrets law afforded the plaintiff greater protection against the defendant than a patent would have.[4] On the other hand,

4. Of course, trade secret protection did not protect the plaintiff from competition by others

who grew their own 17-inch crystal, even if that were accomplished by working backward

*Kewanee,* unlike *Sears* and *Compco,* involved an element of culpable conduct—the breach of trade secret agreements—so that the enforcement of the state law was in the nature of an exercise of the state's police power.

In reaching its decision, the court closely examined the effect of the trade secret law in order to determine if its enforcement would conflict with either of the dual purposes of the patent laws—namely, the policies of encouraging invention and of ensuring disclosure of invention. First, the court set out the standard for determining whether state law is preempted:

> The only limitation on the States is that in regulating the area of patents and copyrights they do not conflict with the operation of the laws in this area passed by Congress  .  .  . .
> The question of whether the trade secret law of Ohio is void under the Supremacy Clause involves a consideration of whether that law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). 416 U.S. at 479, 94 S.Ct. at 1885.

Applying this test, the court found that enforcement of the Ohio trade secret law did not conflict with the purposes of the federal patent laws.

It is in the context of these decisions,[5] then, that this court must determine whether the state law doctrine of misappropriation may properly be applied to the activities of UCC and EDI, or whether application of the doctrine would "stand as an obstacle to the accomplishment of the full purposes and objectives of Congress." That standard, of course, does not draw a clearly defined boundary around the preemptive scope of federal law. In a literal sense, any state regulation of writings and inventions conflicts in some way with the goals of the federal patent and copyright laws. The

question, then, is how much state interference with federal goals can be tolerated. In that regard, the cases suggest several lines of inquiry.

▮▮▮ First, and perhaps most important, is the concept of federalism. Preemption analysis involves by its very nature the problem of federalism, and a state law is far more likely to avoid preemption if it is an exercise of the traditional state power to provide for the health and welfare of its citizens. In both *Goldstein* and *Kewanee,* where state law was found not to be preempted, the activity in question was the type of culpable conduct traditionally governed by state law. Thus in discussing trade secret laws in *Kewanee,* Justice Burger wrote as follows:

> [t]here is the inevitable cost to the basic decency of society when one firm steals from another. A most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable; the state interest in denying profit to such illegal ventures is unchallengeable. 416 U.S. at 487, 94 S.Ct. at 1889.

Thus the state interest in enforcing its law is far more compelling where theft of secrets or "industrial espionage" is involved.

A second line of inquiry suggested by the cases is whether there is a need for uniformity of legislation; that is, whether enforcement of state law would create a risk of conflicting legal standards governing a given type of conduct. This was a concern of the court in *Sears* and *Compco.*

In addition, it is important to determine whether Congress has expressed an intention to leave a matter free of protection, or whether it has simply left the matter "unattended." *Kewanee* may have stripped much of the force from this inquiry but it should be remembered that each of these inquiries is but an avenue of approach to the fundamental question of whether en-

---

from the plaintiff's product. In this sense the trade secret law afforded less protection from competition than a patent would have.

5. *See also Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977); *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

forcement of a state law would interfere unacceptably with the purposes of federal legislation.

In this case there was no theft of trade secrets by EDI or UCC, no breach of contract, and no breach of a confidential relationship.[6] In that sense application of the state misappropriation doctrine here would not be an exercise of the state police power, at least not to the extent of the state laws involved in *Goldstein* and *Kewanee.*

■ The input formats appropriated by the defendants here are not matters left "unattended" by Congress. They are writings within the meaning of the federal copyright laws, and this court found in its order of August 24, 1978 that the formats embody only an idea not an expression, and hence are not copyrightable. Thus the formats are the *type* of things covered by the copyright laws, but they simply do not qualify for protection under those laws; alternatively, if they do, the protection is very narrow. Nor would the format qualify for patent protection. *Gottschalk v. Benson,* 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972); *Parker v. Flook,* 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978). These determinations, however, are not dispositive of the question of preemption in the light of *Kewanee.*

In addition, there is some risk that permitting states to limit the availability of the type of material involved here would result in substantial confusion as to whether use of such formats in a particular state was legal. This is hardly a compelling factor, though, as the *Kewanee* result produced the possibility of an equally nonuniform level of protection for trade secrets.

The overriding question is whether enforcement of the misappropriation doctrine here would conflict unacceptably with the goals of the federal patent and copyright laws. Enforcement of the state law would certainly not interfere with the federal policy of encouraging invention and creativity. On the contrary, that policy would be advanced by permitting the states to protect the input formats involved here. The more difficult question is whether application of the misappropriation doctrine here interferes unacceptably with the federal policy of full disclosure and free use of discoveries except where, in carefully limited circumstances, federal law grants temporary protection.

It is clear, first of all, that application of the misappropriation doctrine here would conflict with the federal policy of disclosure of and free access to discoveries. The result would be that no one could copy Synercom's input formats, and so Synercom would have a favored access to customers using its program, unless a competing package were devised with costs so much lower than Synercom's as to justify the expense of retraining users and of starting anew in the creation of stored data input. Thus the more precise question is whether this conflict with federal law would be so great as to require preemption of the state law.

It is this court's conclusion that the conflict with federal policy would be unacceptable, and that, consequently, the state law doctrine of misappropriation may not be applied to limit the use of Synercom's input format by EDI and UCC. To begin with, this court has found that the input format embodied is an idea and not an expression. None of the cases discussed has permitted a state to regulate the use of ideas. In fact, the court in *Goldstein* was careful to point out that "[n]o restraint has been placed on the use of an idea or concept." 412 U.S. at 571, 93 S.Ct. at 2317. Furthermore, the consequences of applying the misappropriation doctrine here would be significantly greater than the application of the state laws involved in *Goldstein* or *Kewanee.* The tape piracy statute in *Goldstein* did not prevent competition from recording "the same composition in precisely the same manner and with the same personnel as appeared on the original recording." *Id.* The trade secrets law enforced in *Kewanee* did not prevent others from growing a crystal identical to the plaintiff's by independent effort or by working backwards from

**6.** See page 44 below.

the plaintiff's product. Application of the misappropriation doctrine here, however, would have a greater competitive impact, for Synercom's competitors would have to produce a package of substantially lower cost in order to attract any of Synercom's customers. Moreover, the focus of the misappropriation doctrine is much closer to the focus of the federal patent and copyright laws than either a tape piracy statute or a trade secret law, which are more concerned with ethical conduct than with the use of concepts and ideas. Thus the state interest here is not so great as it was in either *Kewanee* or *Goldstein,* where "industrial espionage" was involved. Finally, whereas the misappropriation doctrine typically extends protection for a limited period of time to matters with time value, as in *I.N.S.,* here permanent protection is sought under the statute.[7] Thus enforcement of the doctrine here would work a more significant interference with federal policy than it would in the typical misappropriation case. In sum, assuming that the state law doctrine of misappropriation would prevent the defendants from copying Synercom's input format, the operation of the doctrine here is preempted.

Synercom advances two other theories in support of its claim of unfair competition. The first of these theories is that the defendants, in developing a structural analysis package patterned after that developed by Synercom, breached a duty of confidence owed to Synercom. The premise of the argument is that UCC learned of Synercom's STRAN program as a licensee of Synercom, and EDI learned of it through Bonner & Moore, Inc., another former licensee of Synercom.

■■ An action for unfair competition based upon breach of confidence requires both a confidential relationship—usually by employment, contract, or agency—and confidential material. *Hyde v. Huffines,* 158 Tex. 566, 314 S.W.2d 763 (1958). While there may have been a confidential rela-

tionship here between Synercom and the defendants, the evidence indicates that the matter appropriated—including Synercom's program and input format—was *not* confidential. On the contrary, the input formats were published when the forms for their use were published. With respect to the program itself, the evidence at trial was insufficient to show that EDI's SACS II program was developed from confidential information about the STRAN program obtained by Bonner and Moore during its relationship with Synercom. Thus the breach of confidence theory must be rejected.

■ Synercom's final argument in support of its unfair competition claim is based on this court's finding that EDI and UCC engaged in willful, and hence criminal copyright infringement. Synercom argues from this premise that any illegal conduct in the course of business competition constitutes unfair competition. The problem with the argument is that it relates solely to the defendant's infringement of Synercom's copyright in its user manuals and not to the defendant's use of Synercom's input format. This court has already granted relief for the copyright infringement, and further relief for the same conduct under the theory of unfair competition would be unwarranted.

For the reasons discussed, each of Synercom's arguments in support of its unfair competition claim must be rejected. Thus Synercom's relief is limited to that awarded in this court's order of August 24, 1978.

---

7. Whether the doctrine of misappropriation even extends beyond the realm of matters with time value such as news or broadcasts of sports events is a question that need not be decided here.