The ORTLOFF
CORPORATION, Plaintiff,

v.

GULSBY ENGINEERING, INC., and
Tenneco Oil Company, Defendants.

Civ. A. No. H–83–3062.

United States District Court,
S.D. Texas,
Houston Division.

May 2, 1988.

Dana M. Raymond, William F. Eberle and John D. Murnane of Brumbaugh, Graves, Donohue & Raymond, New York City, William E. Wright of Wright & Patton, P.C., Houston, Tex., and William C. Morrow, Midland, Tex., for plaintiff.

Guy L. McClung of Vaden, Eickenroht, Thompson & Boulware, N. Elton Dry of Pravel, Gambrell, Hewitt, Kimball & Krieger, and Alfred B. Smith, Jr., Houston, Tex., for defendant, Tenneco Oil Co.

G. Byron Jamison, II, and Martin McGregor of Jamison & McGregor, Houston, Tex., for defendant, Gulsby Engineering, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HITTNER, District Judge.

### FINDINGS OF FACT

## I. NATURE OF ACTION AND PLEADINGS

1. This is an action under the patent laws of the United States for infringement of United States Patent No. 4,278,457 (hereinafter called the '457 patent) and for misappropriation of confidential information under the common law of Texas.

2. The Court has jurisdiction over the patent issues under 28 U.S.C. § 1338(a) and venue is proper under 28 U.S.C. § 1400(b). The Court has jurisdiction over the common law claim under 28 U.S.C. § 1338(b).

3. The complaint, filed on May 13, 1983, charges that Defendant Tenneco Oil Company and Defendant Gulsby Engineering, Inc., have each infringed the '457 patent. The amended complaint, filed on March 4, 1985, includes the patent claims and also charges both Defendants with misappropriation of Plaintiff's confidential information.

4. Tenneco's answer, filed on June 13, 1983, and Gulsby's answer, filed on June 12, 1983, raise the defenses of noninfringement, invalidity, unenforceability, and misuse of the '457 patent. Gulsby's answer to the amended complaint, filed on May 13, 1985, included counterclaims against Plaintiff and its parent, Elcor Corporation, under the antitrust laws of the United States and under the Texas law of unfair competition. Gulsby dropped such counterclaims on the first day of trial, March 5, 1987, and the Court dismissed them by Order dated March 6, 1987.

## II. THE PARTIES

5. Plaintiff, the Ortloff Corporation (Ortloff), is a Texas corporation with its principal place of business in Midland, Texas. The '457 patent in suit issued on July 14, 1981, naming Roy E. Campbell and John D. Wilkinson as the inventors. The patent was and is assigned to Plaintiff Ortloff and Ortloff has been the sole owner of all rights, title, and interest in the '457 patent since its issuance.

6. Defendant Tenneco Oil Company (Tenneco) is a Delaware corporation with its principal place of business in Houston, Texas.

7. Defendant Gulsby Engineering, Inc. (Gulsby) is a Texas corporation with its principal place of business in Kingwood, Texas.

## III. THE PROCESS WHICH IS THE SUBJECT OF THE SUIT

### A. *Background*

8. Ortloff charges infringement of the '457 patent in suit by virtue of the design, construction and operation of a cryogenic gas processing plant which was designed and built by Gulsby under contract with Tenneco in Johnson's Bayou, Louisiana, in the Sabine Pass. The accused plant (hereinafter called Sabine Pass Plant) commenced operations in November, 1982.

9. Ortloff gave Tenneco notice of the '457 patent on October 5, 1981. Gulsby was aware of the '457 patent in November, 1981. Ortloff advised both Gulsby and Tenneco on March 2, 1982, that the Sabine Pass Plant then under contract may infringe the Ortloff patent.

10. The processes of the '457 patent in suit relate to gas separation processes. The natural gas used for fuel in commerce is largely methane, which is the most volatile hydrocarbon gas. Typically, however, natural gas also contains ethane (the next most volatile gas) and smaller amounts of heavier hydrocarbons. Ethane has value as a component in the production of a variety of petrochemicals. Accordingly, producers of natural gas have found it profitable to recover ethane and other components from natural gas.

11. In standard commercial plants which have been built since around the 1960's the separation of ethane has been accomplished by cooling the natural gas to a temperature lower than about $-130°F$. At these temperatures, and at a pressure of several hundred pounds per square inch, some of the natural gas condenses to a liquid containing methane, ethane, and most of the less volatile hydrocarbons. The gas is separated in a distillation column to recover a liquid product containing a major part of the ethane which is relatively free of methane, usually referred to as $C_2$ or $C_2+$ liquids.

12. The distillation column in which the separation of the gas components occurs is referred to as a demethanizer column or fractionation column. It separates the methane content of the initial condensate into residue gas which is withdrawn from the top of the column, leaving the ethane and less volatile hydrocarbons as a liquid, which is withdrawn from the bottom. The residue gas from the top of the demethanizer column, which is discharged from the process, contains most of the methane in the original natural gas feed. Because of the low temperatures employed in some natural gas separation process, they are referred to as a "cryogenic" NGL (natural gas liquids) recovery processes.

13. A stream containing the desired $C_2+$ hydrocarbons plus a large amount of methane, is supplied to the demethanizer column. Part of the stream rises as vapor and is discharged as residue gas from the top of the demethanizer column. The other part of the stream containing ethane, and a large amount of condensed methane, falls as liquid into the distillation column in which the methane is separated. The $C_2+$ liquid is recovered from the bottom of the column.

14. Where the $C_2+$ liquids are to be sold for their ethane content, recovery of a large part of the ethane in the natural gas is desirable.

B. *The Invention*

15. Roy E. Campbell and John D. Wilkinson discovered, in connection with cryogenic processing of natural gas containing carbon dioxide as an unwanted ingredient, that high percentages of ethane and heavier hydrocarbons could be recovered while reducing the risk of carbon dioxide icing by dividing the plant's inlet vapor into two streams, subcooling one stream and feeding that stream to the top of the demethanizer column while expanding and cooling the other stream and feeding that stream to the middle of the demethanizer column. The inventors discovered that, when the feeds to the top and mid-column of the demethanizer were suitably arranged, the concentration of carbon dioxide near the top of the demethanizer could be reduced, thereby reducing the risk of carbon dioxide icing in the demethanizer while simultaneously providing for high ethane recovery.

16. The Campbell and Wilkinson split vapor system has been widely adopted by Ortloff and others in the construction and operation of gas processing plants, resulting in design and construction by Ortloff of plants valued in excess of $68 million and in license fees paid to Ortloff greater than $1 million in connection with plants constructed by others.

17. A flow diagram for a cryogenic gas processing plant embodying the split vapor system invented by Campbell and Wilkin-

son and corresponding to Fig. 5 of the '457 patent is reproduced below:

FOLDOUT A

### C. The Claims in the '457 Patent

18. Ortloff asserts that Gulsby and Tenneco have infringed claims 3 and 4 of the '457 patent. Claim 3 reads as follows:

3. In a process for the separation of a feed gas containing methane and ethane into a volatile residue gas containing a major portion of said methane and a relatively less volatile fraction containing a major portion of said ethane, said feed gas containing hydrocarbons and at least 0.02 mole percent carbon dioxide, wherein methane and ethane together comprise a major portion of said feed gas, in said process

(a) said feed gas being cooled under pressure to provide a cooled feed stream;

(b) said cooled feed stream being expanded to a lower pressure whereby it is further cooled; and

(c) said further cooled feed stream is fractionated at said lower pressure in a fractionated column, the overhead temperature of said fractionation column being maintained at a temperature whereby the major portion of said ethane is recovered in said relatively less volatile fraction; the improvement wherein following cooling, said cooled feed stream under pressure is divided into a first and second gaseous streams; and

(1) said first stream is cooled to condense substantially all of it, and is thereafter expanded to said lower pressure;

(2) said second stream is expanded to said lower pressure; and

(3) said expanded first and second streams are thereafter supplied to said fractionation column at first and second feed points, respectively, said first feed point being the top liquid feed to said column, and said second feed point being at a mid-column feed position, the proportion of said feed gas comprising said second stream, and the temperature of said second stream be-

ing sufficient to reduce the risk of carbon dioxide icing in said column, and the temperature of said first stream being effective to maintain said overhead temperature of the fractionation column at a temperature whereby the major portion of said ethane is recovered in said relatively less volatile fraction.

19. Claim 3 is directed to a process for feeding natural gas to a fractionation column (demethanizer column) and recovering ethane as liquid product from the bottom of the column while methane leaves the top of the column as residue.

20. In its decision allowing the issuance of claim 3, the Board of Appeals held that claim 3 is to be interpreted as requiring that ethane shall be recovered and separated from methane in a fractionator column.

21. Claim 3 particularly points out and distinctly claims a particular cryogenic expansion process for high recovery of ethane with reduced risk of icing which process has the following basic characteristics:

(a) The incoming natural gas under high pressure is divided into two gaseous streams, such streams to proceed along separate cooling and pressure reducing paths and to feed a fractionator (demethanizer) at top column and mid-column positions.

(b) The top feed to the fractionation column derived from one of such gaseous streams is condensed (subcooled) and expanded so that the overhead temperature of the column is maintained sufficiently low to minimize the amount of ethane escaping from the top of the column, thereby enhancing the recovery of ethane as liquid product from the bottom of the column.

(c) The mid-column feed, comprising the bulk of the feed and refrigeration supplied to the column, is derived from the other gaseous stream and expanded through a turboexpander to provide a significant amount of the required refrigeration and temperature for cryogenic operation. (In the examples of the patent, the mid-column feed ranges from 60 percent to 80 percent of the total feed to the column.)

(d) The quantity and temperature of the mid-column feed as compared with the top column feed are set to achieve substantial reduction in the concentration of carbon dioxide in the upper regions of the column, where icing is most likely to occur. (In the examples of the patent, the ratio of top column to mid-column feeds ranges from about 40/60 to 20/80.)

22. The requirement in claim 3 that ethane shall be recovered in a fractionation column in such manner as to "reduce the risk of carbon dioxide icing in said column" means that the operation of the demethanizer and the feeds to the demethanizer are so arranged as to provide efficient recovery of ethane while reducing the risk of icing in the column.

23. Claim 3 does not require that all natural gas coming into the plant must be supplied to the demethanizer—it requires only that such natural gas from which ethane is to be recovered shall be fed to the fractionation column. Claim 3 does not preclude a separation step ahead of the column (as done at the Sabine Pass plant) whereby as much as 50 percent of the incoming feed gas is diverted to bypass the fractionator column and is fed directly to residue without the recovery of any ethane from such bypass stream.

24. The requirement in claim 3 that the proportion and temperature of mid-column feed as compared with top column feed shall be sufficient to reduce the risk of carbon dioxide icing means that the quantity and temperature of the mid-column feed shall be effective to reduce the concentration of carbon dioxide in the upper and colder part of the column where the build-up of $CO_2$ is most likely to reach a concentration at which icing can occur.

25. The requirement in claim 3 that the "second stream" shall be supplied to "said second feed point being at a mid-column feed position" means that the mid-column feed shall be supplied so as to achieve the objective of reducing the concentration of carbon dioxide in the upper and colder part of the column as taught in the specification

and as elsewhere pointed out in the claim language.

26. Claim 3 does not require, and the specification does not teach, that such mid-column feed must be a single and undivided stream that is supplied at a single mid-column feed point. In light of the teaching of the patent, claim 3 requires only that such mid-column feed, whether or not divided into one or more streams and whether or not supplied at one or more mid-column feed points, shall be effective to achieve the aforesaid objective of reducing carbon dioxide concentration in the top and colder part of the column.

27. Claim 4 of the '457 patent reads as follows:

4. The improvement according to claim 3, wherein said fractionation column operates with a top column temperature below about −125°F.

28. Claim 4 particularly points out that the demethanizer is operating at temperatures (top column temperature below about −125°F) at which carbon dioxide icing can occur.

## IV. INFRINGEMENT BY GULSBY AND TENNECO OF THE '457 PATENT

### A. *The Original Bids*

29. On July 30, 1981, Tenneco sent to Ortloff, Defendant Gulsby and other potential bidders a specification of requirements for a natural gas processing plant for the recovery of ethane and heavier hydrocarbons that it had decided to have constructed at Sabine Pass.

30. The Tenneco specification required the bidders to provide designs for a gas processing plant offering "maximum recovery of ethane without front and $CO_2$ treating equipment." Tenneco thereby required that any proposed process design was to be capable of handling appreciable quantities of carbon dioxide. The Tenneco specification further mandated that the liquid product should contain not more than 8 percent $CO_2$.

31. Ortloff and Gulsby each submitted bids on October 15, 1981.

32. The proposed Gulsby plant was based on Gulsby's computer simulation of a cryogenic gas processing design which followed a standard expander plant flow plan.

33. The proposed Gulsby design called for four residue gas compressors and for product treating equipment to remove carbon dioxide. Gulsby calculated an ethane recovery of 82.9 percent.

34. The Ortloff bid proposed a design employing Ortloff's then recently patented '457 process. On October 5, 1981, Ortloff had sent a copy of the '457 patent to Tenneco and notified Tenneco's Edward Causey, Kenneth Schorre and Steven Hickman in writing that the Ortloff proposal would be based on the '457 patent.

35. The design proposed to Tenneco by Ortloff offered a guaranteed ethane recovery of 87.5 percent (91.9 percent calculated) while employing only three residue gas compressors. The Ortloff design had no need for product treating equipment. The Ortloff bid indicated that the proposed design could accommodate as much as 1.1 mole percent carbon dioxide in the inlet gas while maintaining ethane design recovery.

36. Tenneco expressed its view to Gulsby that the Gulsby four compressor system would be uneconomical because of its high utilities consumption. Tenneco regarded the Ortloff design as favorable on the matter of utilities consumption.

### B. *Gulsby's Revised Bids*

37. After reviewing the bids, Tenneco went back to Gulsby and asked the contractor to revise its design to decrease horsepower consumption. Gulsby made an effort to do this with its original expander plant design, but ethane recovery fell below 70 percent.

38. Gulsby made an interim revised bid to Tenneco wherein the ethane recovery would be reduced to 74.8 percent and there would be three instead of four compressors and no product treatment for removing carbon dioxide.

39. When considering Gulsby's revised bid, Tenneco expressed concern that the carbon dioxide in the inlet gas could rise

above the 0.63 percent levels earlier specified by Tenneco and might go to 1 percent or higher. The aforesaid process design then being contemplated by Gulsby would not accommodate 1 percent $CO_2$ without icing. Gulsby thereupon and within approximately two weeks revised its bid again based upon its third proposed process design that would embody the split vapor system of the '457 patent. Ortloff's bid indicated that the plant would accommodate up to 1.1 percent $CO_2$ without icing. The Gulsby version of the split vapor design, which Tenneco purchased for the Sabine Pass Plant and which Gulsby built into the Sabine Pass Plant, handles as much as 1 percent $CO_2$ in the feed gas.

40. The flow scheme for the Sabine Pass Plan is reproduced below:

FOLDOUT C

41. This flow scheme, when read in conjunction with the Gulsby computer simulation of the Sabine Pass Plant, indicates that the plant which Gulsby constructed for Tenneco had the following design features:

(a) The feed gas, having a composition of 95.3 percent methane, 2.3 percent ethane, 1 percent carbon dioxide, and the remainder nitrogen and heavier hydrocarbons, entered the plant at a temperature of 100°F and a pressure of 990 psi absolute.

(b) The feed gas was cooled by heat exchanger 100 to a temperature of −83°F.

(c) The feed vapor was then split into streams 101 and 102, both streams being 100 percent vapor.

(d) Vapor stream 101 was 15 percent of the feed gas and vapor stream 102 was 85 percent of the feed gas.

(e) Vapor stream 101 was subcooled in heat exchanger 103 to a temperature of −115°F.

(f) The subcooled vapor stream 101 was flash expanded in valve 104 and this resulted in a stream 105 having a temperature of −138.7°F which was 81 percent liquid.

(g) The subcooled, flash expanded stream 105 was fed to the top of the demethanizer, above the three packed fractionating beds, such that the vapor in the stream exited the top of the column and the liquid fell onto the top backed bed. The top column feed is to theoretical fractionating tray 1 in a 10–tray demethanizer. Stream 105 has the same composition as the feed gas.

(h) The other vapor stream 102 is work expanded in turboexpander 106 resulting in stream 107 which has a temperature

of −136°F, a pressure of 420 psia and a liquid content of 42.3 percent.

(i) Stream 107 is fed to a low pressure separator 108 whereby the vapor and liquid in the stream are separated. The vapor, stream 110, joins with the vapor leaving the top of the demethanizer to form the residue gas.

(j) The liquid leaving the low pressure separator (stream 109) contains 90.7 percent methane, 4.6 percent ethane, 1.7 percent carbon dioxide and the remainder nitrogen and heavier hydrocarbons.

(k) Stream 109 is split into streams 112 and 113. Stream 112, which is 70 percent of stream 109, is reheated in heat exchanger 111 and fed to the middle of the demethanizer at tray 6. After reheating, stream 112 is 96.1 percent vapor and has a temperature of −65°F. Stream 113 is fed to the middle of the demethanizer at tray 3.

(l) The feeds to trays 1, 3, and 6 of the demethanizer are such that approximately 30 percent of the feed is to the top of the column and 70 percent of the feed (feeds to trays 3 and 6) is to the middle of the column.

(m) The carbon dioxide content of the tray 1 feed is 1 percent, the same as the inlet gas, but the carbon dioxide content of the tray 3 and tray 6 feeds is 1.7 percent. The increased carbon dioxide concentrations in the mid-column feeds results from the vapor bypass stream 110. Methane comprises 90.7 percent of each of the tray 3 and tray 6 feeds, and 67.3 percent of the mid-column feed is relatively warm vapor. The methane in the mid-column feeds dilutes the concentration of carbon dioxide in the regions in the demethanizer where icing is most likely to occur.

(n) Overall, the plant recovers 77.2 percent of the ethane in the feed gas. However, about 50 percent of the feed gas coming into the plant (including about 11.9 percent of the ethane) is not fed to the demethanizer and, instead, bypasses the column in stream 110 and goes directly to residue. In the demethanizer where ethane is recovered, 87.6 percent of all ethane that is processed

therein is recovered as liquid product. The level of ethane recovery in the Sabine Pass demethanizer is in precise conformity with the levels of ethane recovery that are reported in the '457 patent.

(o) The carbon dioxide content of the product is 7.4 percent and this meets the Tenneco specification.

(p) Only three residue gas compressors are required and no product treatment is necessary.

42. The Sabine Pass process has each of the basic characteristics required by Claim 3. Those basic characteristics are:

(a) An inlet vapor containing methane (in a majority proportion), ethane and an appreciable quantity of carbon dioxide is cooled under pressure and divided into first and second gaseous streams.

(b) The first stream is condensed and subcooled, flash expanded and fed to the top of the demethanizer column.

(c) The second stream, comprising the bulk of the feed to the demethanizer, is turboexpanded and fed to the middle of the demethanizer column.

(d) The proportions of the feeds to the column are such that about 30 percent is fed to the top of the column and about 70 percent is fed mid-column at trays 3 and 6. The effect of the mid-column feed is to dilute carbon dioxide in the regions of the demethanizer where icing is most likely to occur. The amount of ethane recovered in the demethanizer is more than 84 percent.

43. At the Sabine Pass Plant, about 50 percent of the incoming feed gas bypasses the demethanizer and is fed directly to residue. Such bypass operation is not a part of ethane recovery process at Sabine Pass.

44. At Sabine Pass, the mid-column feed is comprised of two streams that are fed to trays 3 and 6 of the column in quantity, composition and temperatures as stated in Finding 41. Such mid-column feeds function to reduce the risk of icing in the demethanizer at Sabine Pass. There is no requirement that such function must be

performed by a single and undivided mid-column feed.

45. At the Sabine Pass Plant, the ethane recovery process is operated in substantially the same way to accomplish substantially the same results as in the ethane recovery process that is disclosed and claimed in the '457 patent.

## V. MISAPPROPRIATION OF CONFIDENTIAL INFORMATION

46. The circumstantial evidence indicates that the details of Ortloff's proposed design were passed by Tenneco to Gulsby.

47. In the Ortloff design as submitted by Ortloff to Tenneco and only to Tenneco, the inlet gas was to be cooled to 0°F, split in a high pressure cold separator at 955 psi with 40 percent of the inlet subcooled to −125°F, flash expanded to −145°F and fed to the top of the demethanizer. The remainder of the inlet gas stream (60 percent) was to be turboexpanded and fed at −85°F to the middle of the demethanizer. The demethanizer was to operate at 380 psi with a side reboiler duty of 3 million BTUs. Approximately 40 moles of carbon dioxide and 454 moles of ethane were to be recovered in the product. The process was to operate with three solar compressors.

48. With the exception of the side reboiler duty, each value recited in Finding 47 appears in a page of notes which was written by Mr. Gulsby in November, 1981, after a conversation with someone at Tenneco.

49. Although the flow scheme of the process in Gulsby's notes could have been learned from the '457 patent, the only numerical figures noted which appear in the '457 patent are the 40/60 split and the −125°F subcooled stream temperature, but those numerical figures are dispersed in separate examples in the '457 patent.

50. In the gas processing industry, a process design that has been prepared by the bidder and submitted to the prospective plant purchaser for consideration in evaluating the bid is regarded as being proprietary to the bidder and is to be received and maintained in confidence by the plant purchaser. Moreover, the Ortloff bid contained explicit written notice that the process design submitted therewith was proprietary and was not to be disclosed to others, without the written consent of Ortloff. The following notice was affixed to the Ortloff bid drawing which outline Ortloff's proposed process design:

### NOTICE

THIS DRAWING HAS NOT BEEN PUBLISHED BUT RATHER HAS BEEN PREPARED BY THE ORTLOFF CORPORATION FOR USE BY THE CLIENT NAMED IN THE TITLE BLOCK SOLELY IN RESPECT OF THE CONSTRUCTION, OPERATION AND MAINTENANCE AT THE FACILITY NAMED IN THE TITLE BLOCK AND SHALL NOT BE USED FOR ANY OTHER PURPOSE OR FURNISHED TO ANY OTHER PARTY WITHOUT THE EXPRESS CONSENT OF THE ORTLOFF CORPORATION.

51. Although information about competitors' processes could be obtained from individual vendors, such information would be piecemeal in that a vendor would supply information only on a piece of equipment.

52. The information which Tenneco provided to Gulsby concerning Ortloff's proposed process design and its performance enabled Gulsby to provide Tenneco with a plant which would satisfy Tenneco requirements. All bidders knew that the contract would be awarded in mid-December, 1981. On November 30, 1981, Gulsby submitted a second proposal which would not accommodate 1 percent carbon dioxide as required by Tenneco. Gulsby had to move swiftly to offer an acceptable design. Gulsby quickly arrived at its ultimately successful design because of its head start knowledge derived from Tenneco as to how the Ortloff split vapor process could be adapted for use at Sabine Pass.

53. Because it was able to provide Tenneco with a split vapor feed process which satisfied Tenneco's requirements, Gulsby was able to earn a profit of approximately $835,000 on its contract to construct the plant.

## VI. PRIOR REFERENCES—VALIDITY UNDER 35 U.S.C. §§ 102 AND 103

54. The prior references as to which evidence was received at the trial do not disclose, singly or in combination, that the concentration of carbon dioxide near the top of a demethanizer column might be substantially reduced and the risk of icing in the demethanizer thereby diminished when there was a substantial mid-column feed as well as a top column feed to the demethanizer.

55. None of the prior references disclose that the concentration of carbon dioxide in a demethanizer could be affected by the presence or absence of a mid-column feed.

56. None of such prior references disclose a cryogenic process in which the incoming feed gas under pressure was divided into two gaseous streams, one of such streams being condensed and expanded to provide a top column feed to the demethanizer and the other stream being separately expanded and cooled to provide a mid-column feed.

57. In none of such prior references is there any teaching that in a cryogenic expansion process for the recovery of ethane from natural gas containing appreciable amounts of carbon dioxide, the ethane recovery can be increased and the risk of carbon dioxide icing reduced by a suitable arrangement of top column and mid-column feeds to the demethanizer.

58. The prior references, singly or in combination, do not disclose the split vapor system for ethane recovery that is disclosed and claimed in the '457 patent.

59. The prior references cited by Defendants affirmatively demonstrate that the split vapor system of the '457 patent would not have been obvious at the time the invention was made to a person having ordinary skill in the art.

## VII. THE FRAUD DEFENSE

60. The Patent and Trademark Office carefully examined the patentability of the invention claimed in the '457 patent, and the patent application was allowed only after the matter was considered by the Board of Appeals.

61. The record does not contain clear and convincing evidence that Ortloff or its attorneys withheld or concealed anything during the prosecution of the '457 patent which the Examiner might have considered to be important or useful in connection with examination of the '457 patent application. As for the '964 patent, in the name of three inventors and thus a different inventive entity than Campbell and Wilkinson, the inventors of the split vapor system, the '457 patent application had explicitly cross-referenced the copending application for the '964 patent and pointed to its subject matter.

62. It appears from (a) the foregoing findings concerning the prior references cited by Tenneco and Gulsby and (b) the detailed report on the state of the art contained in the Disclosure Statement filed in the Patent and Trademark Office and in the '457 patent itself, that Ortloff acted with reasonable care to make a full disclosure of all information that might have been regarded as material or important by the Patent and Trademark Office in connection with its examination and allowance of the '457 patent.

63. There is not clear and convincing evidence that the Patent and Trademark Office was misinformed or deceived about anything during the prosecution. There is no evidence of wrongful intent or gross negligence by Ortloff with respect to anything that occurred or did not occur during the prosecution for the '457 patent.

## VIII. PATENT MISUSE

64. As a defense to the enforceability of the '457 patent, Defendants contend that Ortloff has misused the '457 patent by seeking to extend its method claims to monopolize or restrain trade in unpatented machinery and apparatus.

65. The evidence shows that Ortloff used the '457 patent to secure contracts to build plants only to the extent that Ortloff's representative told prospective clients that if they used a process which

infringed the '457 patent, Ortloff would take legal action.

## IX. UNCLEAN HANDS

66. In this suit, Ortloff has alleged that Defendants have engaged in patent infringement and in unfair competition against Ortloff. As a defense to these claims, Defendants assert that Ortloff is seeking equity before this Court when its own hands are unclean. Defendants assert that if Ortloff wishes to have equity, it must act equitably itself.

67. Although Ortloff at times obtained information regarding competitors' bids, it would only get entire bids of competitors from past jobs. Ortloff's former director of sales, John Neighbors, testified that no one at Ortloff asked him to get competitors' bid information while the bids were being considered by a client. Process geometry, flows, and temperatures were not the types of information Ortloff would have concerning its competitors' bids.

## X. DAMAGES

68. The evidence adduced at trial shows that, after reviewing all of the bids submitted, Tenneco gave serious consideration to only two proposals and that both of those proposals employed the split vapor system of the '457 patent. Tenneco was looking for an ethane recovery process that provided the advantages of the '457 split vapor system. The evidence thus indicates that, but for the infringement, Ortloff would have been awarded the contract. Ortloff had the capacity to design and build the Sabine Pass Plant at that time. The evidence shows that Ortloff would have received the contract if Tenneco had been willing to negotiate with Ortloff.

69. Ortloff's witness, George Houston, offered testimony and documents were admitted estimating Ortloff's anticipated profit. Mr. Houston, however, testified that there is no way to exactly calculate what the profit would be. The profits accrued by Gulsby, which was ultimately awarded the contract, were approximately $835,000.

70. Although the evidence demonstrates that Tenneco willfully provided Gulsby with confidential information from Ortloff's bid, the evidence also indicates that Gulsby took steps to alter the process in an attempt to avoid infringement. Furthermore, prior to the beginning of operation of the Sabine Pass Plant, Gulsby secured the opinion of Ms. Margaret Skillern–Rudgers, a former Ortloff employee, and of Gulsby's lawyer, both of whom advised Gulsby that there was no infringement. The Court thus does not find that the infringement of the '457 patent was willful.

71. The facts as set forth in the trial do not demonstrate that this is an "exceptional" case, justifying an award of attorney fees.

72. Any finding of fact set forth above which may be construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under conclusions of law.

## CONCLUSIONS OF LAW

### I. JURISDICTION AND STANDING

1. This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1338(a) and (b). Venue is proper under 28 U.S.C. § 1400(b).

2. United States Patent 4,278,457 (the '457 patent) issued on July 14, 1981, naming Roy E. Campbell and John D. Wilkinson as the patentees. The patent was assigned to the Ortloff Corporation, and Ortloff has been the sole owner of all rights, title and interest in the '457 patent since the assignment. Ortloff thus has standing to pursue this action.

### II. VALIDITY OF THE PATENT

*A. Burden of Proof*

3. The granting of the '457 patent by the United States Patent and Trademark Office created a presumption of validity which casts on Defendants Gulsby and Tenneco the burden of persuasion that the '457 patent is invalid. 35 U.S.C. § 282 (1982). The party who asserts invalidity of a patent must carry that burden of persuasion by clear and convincing evidence.

*Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1569, 1575 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

4. While the legal presumption of validity can neither be strengthened nor destroyed, the burden of proving invalidity is made heavier where, as in the instant case, the patent was given extended scrutiny by the Patent and Trademark Office and its tribunal on matters within their specific field of expertise, including the interpretation and pertinency of the prior art. *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed.Cir.1985).

B. *Validity Under 35 U.S.C. § 112*

5. Under 35 U.S.C. § 112, a patent must disclose the patentees' invention and must particularly point out and distinctly claim it. Section 112 further requires that claimed subject matter in a patent application be described in such full, clear, concise, and exact terms as to enable any person skilled in the art to make and use it. *White Consolidated Indus., Inc. v. Vega Servo Control, Inc.*, 713 F.2d 788, 790 (Fed.Cir.1983). The issuance of a patent creates the presumption that the disclosure and claims satisfy the requirements of 35 U.S.C. § 112. 35 U.S.C. § 282 (1982).

6. Defendants have not shown by clear and convincing evidence that the '457 patent fails to satisfy the requirements of § 112. *See* Findings of Fact 17–21. Accordingly, the Court concludes that the patent is not invalid under 35 U.S.C. § 112.

C. *Validity Under §§ 102 and 103*

7. The presumption of validity of a patent applies to attacks based on § 102 or § 103 of the patent laws, and the burden is on the accused infringers to establish anticipation (§ 102) or obviousness (§ 103) by clear and convincing evidence. *Armco, Inc. v. Republic Steel Corp.*, 707 F.2d 886, 889 (6th Cir.1983).

8. To show anticipation under 35 U.S.C. § 102, all elements of the claims of the patent in suit must be shown in a single reference. *Carman Indus., Inc. v. Wahl*, 724 F.2d 932, 937–38 (Fed.Cir.1983). This has not been shown in the instant case.

*See* Findings of Fact 54–59. Defendants have failed to show anticipation by clear and convincing evidence. Consequently, the Court concludes that the '457 patent is not invalid under § 102.

9. In determining obviousness under 35 U.S.C. § 103, the Court must weigh the factual issues relating to (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the act. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). Other relevant considerations are facts relating to commercial success, long-felt but unsolved need, and failure of others to conceive and reduce to practice the invention. *Id.* at 17–18, 86 S.Ct. at 693–694.

10. The elements relied on by Defendants existed in the prior art for years, available to skilled persons, without suggesting the Ortloff split vapor system invention. This itself is evidence of nonobviousness. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1577 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The '457 patent solved a persisting problem in the industry. Long-felt but unsolved needs and the failure of others are persuasive evidence that the invention was not obvious. *See Graham v. John Deere Co., supra* 383 U.S. at 17–18, 86 S.Ct. at 693–694. Defendant Gulsby's deliberate selection of the invention of the '457 patent for use at Sabine Pass, after study of the '457 patent based on Ortloff's bid to Tenneco, is indicative of nonobviousness. *Windsurfing Int'l. Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed.Cir. 1986), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986).

11. Defendants have failed to show obviousness by clear and convincing evidence. Consequently, the Court concludes that the '457 patent is not invalid under 35 U.S.C. § 103.

III. ENFORCEABILITY OF THE '457 PATENT

A. *Fraud*

12. A patent applicant owes an uncompromising duty of candor to the United

States Patent and Trademark office during prosecution of a patent application. *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir.1983).

13. Inequitable conduct before the Patent and Trademark Office in violation of the uncompromising duty of candor renders a patent unenforceable, even if the patent is otherwise valid in every respect. *Norton v. Curtiss*, 433 F.2d 779, 793 (C.C. P.A.1970).

14. The proscribed inequitable conduct encompasses affirmative acts of commission, *e.g.*, submission of false information, as well as omission, *e.g.*, failure to disclose material information. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed. Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

15. Although the standard of proof of inequitable conduct before the Patent and Trademark Office that may render a patent unenforceable is less stringent than that required for common law fraud,[1] clear and convincing evidence of inequitable conduct is required. *Id.*

16. Defendants have not shown inequitable conduct on the part of Ortloff by clear and convincing evidence. *See* Findings of Fact 60–63. Consequently, the Court concludes that the '457 patent is not unenforceable on the ground of inequitable conduct.

### B. *Patent Misuse*

■ 17. The doctrine of patent misuse denies to a patentee, after issuance, the power to use the patent in such a way as to acquire monopoly power that is not plainly within the terms of the patent grant. The doctrine is founded in the public interest in free competition. *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648, 696 (D.S.C.1977), *aff'd in part and rev'd in part*, 594 F.2d 979 (4th Cir.), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980).

18. A determination that a patent has been misused precludes the patentee from invoking the aid of the courts to enforce the patent rights until the misuse is purged. *Robintech, Inc. v. Chemidus Wavin, Ltd.*, 450 F.Supp. 823, 834 (D.D.C. 1978), *aff'd in part and rev'd in part*, 628 F.2d 142 (D.C.Cir.1980).

19. A method and apparatus for practicing the method are separately patentable. 35 U.S.C. § 101 (1982). A patented process is a separate and distinct entity as compared to apparatus and materials used in the process. *See generally Senza–Gel Corp. v. Seiffhart*, 803 F.2d 661, 664–65 (Fed.Cir.1986).

20. Ortloff did not use the '457 patent as a means of acquiring monopoly power over unpatented material. *See* Finding of Fact 65. The Court, thus, concludes that the '457 patent is not unenforceable due to patent misuse.

## IV. PATENT INFRINGEMENT

■ 21. Having concluded that the '457 patent is valid and enforceable, the Court turns to the issue of patent infringement. A finding of infringement is not precluded merely because an accused process does not fall literally within the claims of a patent. The claims of the patent are not restricted to the particular modes of use described in the specification. *Smith v. Snow*, 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721 (1935); *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572, 1579 (Fed. Cir.1983). A patent is not limited to the preferred embodiments shown in the examples or drawings. *See Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 418–19, 28 S.Ct. 748, 751, 52 L.Ed. 1122 (1908); *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 869 (5th Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973). Merely adding a step to a process does not avoid infringement. *Amstar Corp. v. Envirotech Corp.*, 730

1. Common law fraud requires (1) misrepresentation of a material fact; (2) an intent to deceive or scienter; (3) justifiable reliance on the misrepresentation which induced the deceived party to act; and (4) the deceived party's injury resulted from reliance on the misrepresentation. *Norton v. Curtiss*, 433 F.2d 779, 793 (C.C.P.A. 1970); *J.P. Stevens v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

F.2d 1476, 1482 (Fed.Cir.), *cert. denied,* 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984). Rather, for there to be an infringement under the doctrine of equivalents, an accused process must be substantially the same thing used substantially the same way to achieve substantially the same result as the patented process. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

22. The ethane recovery process at Sabine Pass operates in substantially the same way to accomplish substantially the same results as disclosed and claimed in the '457 patent. *See* Findings of Fact 15–28, 39–44. Claims 3 and 4 of Ortloff's '457 patent have been infringed by Defendants Tenneco and Gulsby in the construction and operation of the Sabine Pass Plant.

## V. UNFAIR COMPETITION/IMPROPER USE OF CONFIDENTIAL INFORMATION

23. Ortloff alleges that Defendant Tenneco engaged in unfair competition by disclosing confidential information from Ortloff's bid to Gulsby. The evidence shows that details of Ortloff's proposed design were passed by Tenneco to Gulsby.

24. An action for unfair competition based on breach of confidence requires both a confidential relationship and confidential material. *Synercom Technology, Inc. v. University Computing,* 474 F.Supp. 37, 44 (N.D.Tex.1979). The written notice contained in Ortloff's bid, together with understanding within the industry that bid information was to be maintained in confidence, establish a confidential relationship between Tenneco and Ortloff. *See* Finding of Fact 50. The only numerical figure in Gulsby's notes which could have been obtained from the '457 patent are the 40/60 split and the −125°F subcooled stream temperature. Information could only be obtained from vendors in a piecemeal fashion. The details of the drawing passed by Tenneco to Gulsby therefore constitute confidential information. *See* Findings of Fact 49 and 51.

25. Tenneco is liable to Ortloff for improper use of Ortloff's confidential information.

26. Ortloff has also alleged that Gulsby engaged in unfair competition by misappropriation of Ortloff's bid information. The elements of an unfair competition cause of action by misappropriation are: (1) Plaintiff created his product through extensive time, labor, skill, or money; (2) Defendant used Plaintiff's product in competition with Plaintiff, gaining a special advantage because Defendant bore little or no burden of expense of development; and (3) Defendant's use of Plaintiff's product caused commercial damage to Plaintiff. *Schuchart & Assocs., Professional Engineers, Inc. v. Solo Serve Corp.,* 540 F.Supp. 928, 937 (W.D.Tex.1982). The Court has found all of the above elements present in this case. *See* Findings of Fact, 15, 29–39, 52, 53, 68.

27. Gulsby is liable to Ortloff for unfair competition by misappropriation.

## VI. DAMAGES

28. Pursuant to 35 U.S.C. § 283, Ortloff is entitled to an injunction prohibiting Defendants from further infringing the '457 patent. 35 U.S.C. § 283 (1982). *See generally Polaroid Corp. v. Eastman Kodak Co.,* 789 F.2d 1556, 1557 (Fed.Cir.), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986).

29. Ortloff is entitled to an award of damages adequate to compensate it for the infringement of the '457 patent. 35 U.S.C. § 284 (1982). Although evidence was received estimating Ortloff's projected profits had it been awarded the Tenneco contract, the Court concludes that Ortloff's profits cannot be exactly calculated. Under such circumstances, the Court may consider evidence of Gulsby's profits and use such profits to estimate Ortloff's lost profits. *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 654 (Fed. Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). The facts demonstrate that Gulsby's profits were approximately $835,000. *See* Finding of Fact 69.

30. Ortloff is also entitled to relief as a consequence of Gulsby's and Tenneco's acts of unfair competition.

31. Defendants Gulsby and Tenneco are liable to Ortloff in the amount of $835,000, the amount of Gulsby's profits.

32. Ortloff is also entitled to an award of prejudgment interest. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983); *Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 23–24 (Fed.Cir.1984). In determining the amount of prejudgment interest herein, the Court looks to the current Texas interest rate on judgment awards provided in Tex.Rev.Civ. Stat. art. 5069–1.05 § 2 (Vernon Supp. 1986); *Koonce v. Quaker Safety Prods. & Mfg.*, 798 F.2d 700, 721–22 (5th Cir.1986). Interest on judgment is to be determined in view of the interest rate computed by the Consumer Credit Commission on the 15th day of each month. If the computed rate is less than 10 percent, the judgment rate shall be 10 percent. Tex.Rev.Civ.Stat. art. 5069–1.05 § 2 (Vernon Supp.1986).

33. The measure of prejudgment interest adopted by the Court is 10 percent.

34. Where infringement is willful and wanton, the Court has discretion to award treble damages. 35 U.S.C. § 284 (1982). *Baumstimler v. Rankin*, 677 F.2d 1061, 1073 (5th Cir.1982).

35. Because the evidence indicates that Gulsby took steps to alter Ortloff's process in an attempt to avoid infringement and Tenneco sought legal advice prior to the beginning of operation of the Sabine Pass Plant, the Court concludes that Plaintiff has not proved bad faith on the part of Gulsby or Tenneco. Consequently, the Court declines to award treble damages.

36. In exceptional cases, the Court may award reasonable attorneys fees to the prevailing party. 35 U.S.C. § 285 (1982). The prevailing party must prove the exceptional nature of the case by clear and convincing evidence. *Machinery Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 471 (Fed.Cir. 1985). Ortloff has not presented clear and convincing evidence that this case is exceptional. Consequently, the Court declines to award attorneys fees in this case.

37. Any conclusion of law entered herein which may be construed in whole or in part as a finding of fact shall be so deemed and treated as if set forth under the Findings of Fact herein.