TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00623-CV






Parker Barber & Beauty Supply, Inc., Appellant


v.


The Wella Corporation, Donald German and Stephen Crawford, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. GN200002, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 Appellant Parker Barber & Beauty Supply, Inc. ("Parker"), an Austin-based beauty
supply company, served as the exclusive distributor of Wella hair-care products in Central Texas for
nearly twenty years. Upon Wella's termination of its distributorship agreement, Parker sued
appellees, The Wella Corporation and two of its corporate officers, Donald German and Stephen
Crawford (collectively, "Wella"), alleging, in essence, that Wella had stolen and misused Parker's
confidential trade secrets. The trial court granted summary judgment in Wella's favor, and Parker's
appeal followed. Parker claims that the summary judgment order was not a final order or, if final,
it awarded more relief than Wella was entitled to receive. Further, Parker asserts that the trial court
erred in refusing to grant Parker an extension of time to respond to Wella's summary judgment
motion and in granting summary judgment because Parker produced evidence raising a genuine issue
of material fact on each of its claims. We will affirm. 


BACKGROUND

Parker and Wella's Business Relationship


 The Parker Barber & Beauty Supply company was opened in the 1940s by the Parker
family in Austin, Texas. (1) Around 1954, Parker began selling the Wella Classic line of hair-care
products, which were consumer rather than professional grade. Approximately thirty years later,
around 1984, Parker became the exclusive Central Texas distributor of the Wella International line,
which was solely available to professional salons and stylists. Parker claims that it invested
significant time and money building Wella's reputation by changing the beauty industry's perception
of Wella from a "drugstore" to a "professional" image. 

 In the spring of 1996, Parker and Wella executed a Distribution Agreement to
formalize the terms of their relationship. The Agreement designated Parker as Wella's exclusive
distributor for 65 counties in Central Texas and, as such, obligated Parker "to use substantial efforts
to promote, educate with respect to, and distribute Wella Products to professional customers." 
Wella, in turn, was bound to provide "technical assistance and training," "attend sales meetings on
a reasonable regularly scheduled basis," "participate in . . . clinics and shows," and "supply at no
charge to Distributor reasonable quantities of sales and educational materials." The Agreement also
provided that "Wella, in its sole discretion, shall make available additional incentives to assist
Distributor in promoting sales of Wella Products." The Agreement had an effective date of April
1, 1996, and was to automatically renew each year "unless earlier terminated or not renewed." The
Agreement also contained a forum selection clause stating that any dispute arising under or related
to the Agreement shall be filed and adjudicated in Virginia.

 It is undisputed that, over the course of their relationship, Parker was dedicated to
increasing sales of Wella products. Wella recognized Parker's efforts, bestowing various accolades
on Parker--including naming Parker as the "distributor of the year" in 1998. Also, statistical charts
produced by Wella show that Parker tripled its sales of Wella products from 1997 to 1999 and that,
by 2000, Parker was selling Wella products to over 1,400 customers, which accounted for 66% of
Parker's potential market. According to Parker, although it also sold other brands' products, the
Wella sales comprised the majority of its business.

 As a means of increasing sales, and as expressly contemplated by the Agreement,
Wella would occasionally run incentive/rebate programs, whereby distributors (such as Parker)
would give discounts to salon customers who purchased large volumes of Wella products, and Wella
would provide a rebate to the distributors to offset the cost of the discounts. These programs were
known as the "market leader" and "alliance incentive" programs because they targeted the largest
customers. To obtain the rebates, Parker had to supply Wella with the customers' names, contact
information, and amount of product purchased. 

 In 1993, Wella had acquired a controlling interest in another company that also
manufactured professional hair-care products, Sebastian. Parker claims that, for years thereafter, it
relied on Wella's claims that Parker would eventually be granted the right to distribute the profitable
Sebastian line. Ultimately, however, Wella did not award Parker the Sebastian contract. 

 Instead, after the Wella and Sebastian companies officially merged in 2000, they
decided to use Sebastian's pre-existing, in-house sales team to distribute both Sebastian and Wella
products in Central Texas. Thus, on February 1, 2001, Wella notified Parker that its Distribution
Agreement would be terminated sixty days later, on April 2. Following Parker's termination, the
Sebastian sales team began distributing Wella products to the customers in Parker's former market. 


Procedural History


 Parker filed suit against Wella and two of its officers, German and Crawford, in
January 2002. Parker sought actual and punitive damages for Wella's (1) misappropriation of
proprietary, confidential, and trade secret information; (2) misappropriation of time, labor, skill, and
money; (3) unjust enrichment; (4) fraud; (5) unfair competition; (6) breach of confidential
relationship; (7) breach of contract; and (8) tortious interference with existing and prospective
business relations. Parker also sought a declaratory judgment that Wella's forum selection clause
was invalid. The essence of Parker's claims was that Wella knew in 1997 that it would be
terminating Parker as its distributor, yet purposefully obtained as much confidential information
from Parker as possible to allow Wella to instantly take over the market following the 2001
termination. 

 Wella initially responded with a motion to dismiss, claiming that--based on the
Distribution Agreement's forum selection clause--Parker was bound to litigate its claims in
Virginia. Following Parker's response to the motion, the trial court conducted a hearing and, in
March 2003, signed an order denying Wella's motion to dismiss. Thereafter, Parker and Wella
proceeded with discovery and other matters in Travis County.

 Then, in May 2004, Wella moved for a traditional and no-evidence summary
judgment on "all claims raised by Parker," asserting six separate grounds, including that all of
Parker's claims were precluded by the Distribution Agreement and, alternatively, that all of Parker's
claims except for breach of contract were precluded by the fact that none of the information obtained
from Parker could be classified as a "trade secret." 

 From May to June 2004, the parties encountered scheduling difficulties related to
various depositions, which resulted in Parker filing a June 4 motion for continuance of the June 28
trial setting, claiming that Wella had purposefully delayed the depositions of key witnesses under
its control. On June 10, the trial court denied the motion. That same day, Parker filed a motion for
an extension of time to file its summary judgment response, reciting the same arguments as those
posed in its motion for continuance, with a conditional response attached. By proceeding with the
summary-judgment hearing on June 14, the court impliedly overruled Parker's request for an
extension. However, the court allowed Parker to file a supplemental summary judgment response
and sur-reply on June 17, and the court's order expressly stated that it had considered the parties'
arguments, as well as "the motion, responses, and other papers filed in this cause, including the
briefs submitted after the June 14th hearing." 

 The June 21, 2004 order also stated that "the court ORDERS that the Wella
Defendants' motion for summary judgment is GRANTED. It is therefore ORDERED that Parker
Barber & Beauty Supply, Inc. ("Parker") TAKE NOTHING on its claims against the Wella
Defendants. . . . All relief requested in this cause but not expressly granted in this final judgment
is denied." 

 Three weeks later, Parker filed a motion for new trial and a motion for
reconsideration, both of which were opposed by Wella. In Parker's August 27 response to Wella's
opposition, Parker attached 24 new documents as evidence. Wella objected to this evidence as being
untimely and unauthenticated. On October 1, the court ordered that Wella's objections to the
evidence were dismissed as moot because Parker's motions had been overruled by operation of law. 
On appeal, Parker attempts to rely on these 24 late-filed documents as evidence to support its claim
that the summary judgment was improper, and Wella moves to strike these documents, as well as
the portions of Parker's brief relying on them.

 Additionally, Parker claims on appeal that (1) the June 21 order was not a final order
because it did not expressly rule on Parker's request for a declaration that Wella's forum selection
clause was invalid; (2) if the order was final, it improperly granted Wella more relief than it was
entitled to receive; (3) the trial court erred in refusing to grant Parker an extension of time to respond
to Wella's summary judgment motion; and (4) the trial court erred in granting summary judgment
because Parker produced evidence raising a genuine issue of material fact on each of its claims. We
will first address the assorted procedural and evidentiary issues raised by the parties and then turn
to the merits of the summary judgment.


ANALYSIS

Finality of the June 21 Order

 In its first issue, Parker claims that the June 21 summary judgment order was
interlocutory, rather than final, because it failed to address Parker's request for declaratory relief. 
Alternatively, in its third issue, Parker claims that, if the order did encompass a ruling on the
declaratory judgment, then Wella was granted more relief than it was entitled to because Wella's
motion for summary judgment did not address the declaratory judgment issue.

 Absent an express grant of authority, we lack subject-matter jurisdiction to consider
an appeal from an interlocutory order. See Lehmann v. Har-Con Corp., 39 S.W.3d 191, 195 & n.12
(Tex. 2001) (citing Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (West Supp. 2005)). Thus, we must
first determine whether the June 21 order from which Parker appeals was "final." In Lehmann, the
supreme court clarified the test for determining "when a judgment rendered without a conventional
trial on the merits is final for purposes of appeal." Id. The court concluded that


in cases in which only one final and appealable judgment can be rendered, a
judgment issued without a conventional trial is final for purposes of appeal if and
only if either it actually disposes of all claims and parties then before the court,
regardless of its language, or it states with unmistakable clarity that it is a final
judgment as to all claims and all parties.



Id. at 192-93 (emphasis added). The court further held that the inclusion of a Mother Hubbard
clause--a recitation that "all relief not expressly granted is denied"--provides no indication of
finality in a judgment rendered without a trial on the merits. Id. at 192, 203-04. The court instructed
that, in determining whether the judgment was intended to be final, the reviewing court should look
to the record in the case: "A judgment that finally disposes of all remaining parties and claims,
based on the record in the case, is final, regardless of its language." Id. at 200. The reviewing court
should also consider the language used in the order: It is not enough that the order merely uses the
word "final"; rather, the intent of finality "must be unequivocally expressed." Id. For example,
"language that the party take nothing by his claims in the case . . . shows finality if there are no other
claims by other parties." Id. at 205. Finally, the court held that if the judgment clearly disposes of
all claims and parties, yet there was not an adequate basis in the record for doing so, then the
judgment may be erroneous and reversible on the ground that the defendant was granted more relief
than he was entitled--but it is still a final, rather than interlocutory, judgment. Id. at 200 (providing
example of defendant moving for summary judgment on only one of plaintiff's four claims, yet court
grants summary judgment as to all four). 

 Here, the June 21 order was titled "Final Summary Judgment," and it expressly
ordered that Parker "take nothing on its claims against the Wella Defendants," who were individually
named in the preceding sentence. Because Parker was the only plaintiff, and all of the defendants
were included, there were no remaining parties not addressed by this language. See id. at 205. The
judgment also stated that "[a]ll relief requested in this cause but not expressly granted in this final
judgment is denied." Although basic Mother Hubbard language cannot be relied on to demonstrate
finality, see id. at 203-04, we note that the court again used the phrase "final judgment" in this
recitation. Finally, this order was issued in response to Wella moving for summary judgment on "all
claims raised by Parker." Nonetheless, Parker argues that the judgment did not actually dispose of
all claims because it did not address its request for a declaratory judgment. Wella responds that,
because the requested declaratory judgment was moot at the time of the summary judgment, the
judgment in fact addressed all pending claims and was, therefore, final. 

 In its petition, Parker sought damages based on tort and contract causes of action, as
well as relief in the form of "a declaratory judgment that the forum selection clause in the
distribution agreement is invalid and that the proper forum is in Travis County, Texas." Wella filed
a "motion to dismiss based upon the parties' forum selection agreement," claiming that the clause
was valid and enforceable, and that it bound Parker to bring its claims in Virginia. Parker responded
that the forum selection clause should not be enforced and that, instead, the litigation should
continue in Travis County. After a hearing, the court denied Wella's motion to dismiss. Thereafter,
litigation continued in Travis County.

 A declaratory judgment is available only when there is a justiciable controversy
between the parties. Brooks v. Northglen Ass'n, 141 S.W.3d 158, 163-64 (Tex. 2004). That is, the
Declaratory Judgment Act does not empower a court to render an advisory opinion or to rule on a
hypothetical fact situation. Id. at 164. There are two prerequisites for a declaratory judgment action:
(1) there must be a real controversy between the parties and (2) the controversy must be one that will
actually be determined by the judicial declaration sought. Houston Chronicle Publ'g Co. v. Thomas,
196 S.W.3d 396, 401 (Tex. App.--Houston [1st Dist.] 2006, no pet.) (citing Tex. Civ. Prac. & Rem.
Code Ann. § 37.008 (West 1997)); Stein v. First Nat'l Bank of Bastrop, 950 S.W.2d 172, 174 (Tex.
App.--Austin 1997, no writ).

 Here, there was no need for the trial court to declare that the forum selection clause
was invalid because, by denying Wella's motion to dismiss based on the clause, Parker obtained the
relief it requested: the ability to litigate in Travis County. See Houston Chronicle, 196 S.W.3d at
401 (plaintiffs' request that court declare their legal entitlement to autopsy report became moot when
plaintiffs received copy of report). Thus, there was no longer a live controversy between Parker and
Wella concerning the proper forum for litigation. (2) Following the denial of Wella's motion to
dismiss, a declaration that the forum selection clause was invalid--i.e., that Parker was not bound
by the clause to litigate in Virginia and could, instead, maintain its suit in Travis County--would
have had no practical legal effect because the case had already been maintained in Travis County. 
See id. Thus, considering both the language of the judgment and the record in this case, the June 21
order was final because it "dispose[d] of all remaining parties and claims" that were pending at the
time. See Lehmann, 39 S.W.3d at 192. Parker's first issue is overruled.

 Furthermore, because Parker's request for declaratory relief had become moot, it was
unnecessary for Wella to specifically address the claim in its summary judgment motion. 
Accordingly, the court's final summary judgment order did not provide Wella with more relief than
it was entitled. See id. at 200. Parker's third issue is overruled.





Motion for Extension of Time


 Parker claims in its second issue that the trial court erred by failing to grant Parker
an extension of time to conduct additional depositions before responding to Wella's summary
judgment motion. Wella responds that the trial court did not abuse its discretion because Parker was
responsible for the delay.

 Texas Rule of Civil Procedure 5 allows a party to seek an extension of time to act,
including filing a response to a summary judgment motion, either before or after the deadline has
passed. Tex. R. Civ. P. 5. If the request for extension is made prior to the deadline, the court has
discretion to grant it with or without notice or a motion, as long as there is "cause shown." Id. 
However, if the request for extension is not made until after the deadline, then the party must file a
motion and demonstrate "good cause" for its failure to act within the deadline. Id. Because the
ability to grant or deny the extension is a matter committed to the trial court's discretion, we review
its decision for an abuse of discretion and we may not substitute our judgment for that of the trial
court. Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). The trial court does not abuse
its discretion if some evidence reasonably supports its decision. Butnaru v. Ford Motor Co., 84
S.W.3d 198, 211 (Tex. 2002).

 The deadline for filing a summary judgment response is seven days before the
hearing. Tex. R. Civ. P. 166a(c). Here, the summary judgment hearing was set for June 14, meaning
that Parker's response was due on Monday, June 7, 2004. Parker, however, missed this deadline and
did not file its motion for an extension of time until June 10. Thus, Parker was required to show
"good cause" for its failure to timely act. See id. 5. 

 Under a similar factual scenario, the supreme court held that a party can demonstrate
good cause for its failure to timely file a summary judgment response "by showing that (1) the failure
to respond was not intentional or the result of conscious indifference, but the result of accident or
mistake, and (2) allowing the late response will occasion no undue delay or otherwise injure the party
seeking summary judgment." Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 688
(Tex. 2002) (regarding motion for leave to file late summary judgment response, "counsel's bare
assertion that he had 'miscalendared' the summary-judgment hearing" was not good cause). 

 Here, Parker asserted that it was unable to timely file a response because Wella had
"repeatedly delayed depositions of key witnesses." Specifically, Parker claimed that Terry Webb,
Andrew Biazis, and Scott Cox were former Wella officers under Wella's control, and that Wella's
"tactics" had prevented Parker from deposing the witnesses in time to incorporate their testimony
into its response. (3) Parker, therefore, sought to extend its response deadline to provide enough time
to complete these three depositions and use the testimony as evidence in opposition to summary
judgment. 

 The record demonstrates that, as of September 2003, Parker was aware that Webb and
Biazis were witnesses with relevant knowledge and that the trial date had been set for July 28, 2004. 
Yet, Parker waited until the last week of April 2004 and the beginning of May 2004 to attempt to
schedule Webb's and Biazis's depositions. (4) Thereafter, the record reflects that Parker--who was
attempting to depose five of Wella's witnesses during the first week of June (5)--was responsible for
several of the scheduling difficulties because Parker repeatedly rescheduled, provided short notice,
and failed to consult with opposing counsel about their availability for depositions. For example,
in a May 14 letter, which was produced by Parker as an exhibit to support its request for an
extension, Wella wrote to Parker that, 


Unfortunately, in view of the history of this case, we cannot agree to a simple
rescheduling. Indeed, the thrust of Wella's pending motion to compel is that
agreements between the parties on scheduling are simply not enough to protect
Wella. That said, your proposal does not take into account that Wella employees
have repeatedly held open dates for depositions, rearranged their schedules, and
prepared for depositions, only to have to do it again (and again). Wella has been
forced to expend attorneys' fees in filing motions to compel and opposing motions
to quash, and your firm reneged on previously agreed dates.


Additionally, as demonstrated by another letter attached to Parker's extension request, on May 26,
in response to Parker's letter that Webb's deposition would take place on June 3-4, Wella wrote,


In view of our present schedule [of Parker also deposing three other Wella witnesses
in Los Angeles on June 3-4], it would likely be impossible to fit the deposition in that
week. Further . . . [Mr. Webb] indicated that, while he would be in Los Angeles part
of that week, he does not have sufficient time for deposition preparation and
deposition. . . . 


On a similar note, your recent letters indicate there are many witnesses you still want
to depose, including third-parties Terry Webb, Andy Biazis, and others. We do not
understand how you plan to take all these depositions in the few weeks before trial.
. . . [If you plan to continue with the July 28 trial setting], we will oppose going
forward with these third party depositions in the month before trial, other than those
[three] listed above, which have been scheduled by agreement and/or court order.

Webb's and Biazis's depositions were ultimately scheduled for June 8 and June 22, respectively. 

 Based on this record, it does not appear that Wella was responsible for delaying the
Webb and Biazis depositions. Based on this evidence, which was presented to the trial court in
connection with Parker's request for an extension, Parker demonstrated no "good cause" for its
failure to act on these depositions from September 2003 (when Parker was aware of both these
witnesses' relevance as well as the July 2004 trial setting) until April-May 2004. Thus, we cannot
say that the trial court abused its discretion in finding that Parker lacked good cause for the delay
associated with the Webb and Biazis depositions and, therefore, in refusing to grant Parker an
extension of time to file its response on this basis. See Carpenter, 98 S.W.3d at 688. (6)

 We now turn to the facts regarding Scott Cox's deposition. The first relevant event
occurred in December 2003, when Brant and Carol Parker recorded a telephone conversation they
had with Cox about Wella's decision to terminate Parker's Distribution Agreement. It is apparent
from the transcript of the conversation that Cox was unaware it was being recorded and, in fact,
stated repeatedly that the Parkers should not disclose that the conversation even occurred. Nearly
a year later, on March 3, 2004, Parker noticed its intent to depose Cox. Wella moved to quash this
deposition. The record does not reflect what transpired with regard to this motion, but in late May,
Parker and Wella confirmed that Cox would be deposed on June 3. Two days before Cox's
scheduled deposition, Parker first produced the transcript of the Cox/Parker telephone conversation. 
Wella immediately responded on June 2, stating,

Late yesterday, we received a copy of what appears to be a transcript of a December
2003 telephone conversation between Sebastian's former senior vice president Scott
Cox, and Brant and Carol Parker in which they discuss the substance of this
litigation. The information in this document is directly contrary to what he told
Wella in advance of his deposition. . . . [Accordingly], we can no longer represent
Mr. Cox for purposes of his deposition . . . [and] have advised Mr. Cox that, in view
of this transcript, he should seek his own attorney. . . . [We may] seek other remedies
based on (1) this ex parte contact with a former Sebastian officer, made expressly to
affect Wella's potential liability, and (2) the withholding of this document, despite
numerous requests for its production, until the eve of the scheduled deposition.


On June 8, the parties entered a Rule 11 Agreement that Cox's deposition would occur on June 9.

 Again, based on the record before us, it does not appear that Wella was responsible
for the delay. Parker does not complain about any scheduling difficulty with Cox's deposition until
Wella's June 2 cancellation. Yet, Parker chose to conceal the existence of the transcript (which had
been in Parker's possession for six months) until the eve of the deposition. Thus, we cannot say that
the trial court abused its discretion in refusing to grant Parker an extension of time to file its
summary judgment response on the basis of any delay related to Cox's deposition. See id. (7)

 Parker's second issue is overruled. 


Motion to Strike Late-Filed Evidence


 Before turning to the merits of the summary judgment, we must determine what
evidence was properly before the trial court for consideration in connection with the motion. Thus,
as an initial matter, we consider (1) Wella's motion in this Court to strike 24 exhibits that were filed
by Parker for the first time in connection with its motion for new trial/motion for reconsideration,
as well as the portions of Parker's brief relying on those exhibits, and (2) Parker's response to that
motion.

 It is well established that in considering a motion for summary judgment, the trial
court shall consider only the evidence that is on file at the time of the hearing or that is filed with
permission of the court after the hearing but before the judgment is signed. Tex. R. Civ. P. 166a(c);
Valores Corporativos, S.A. de C.V. v. McLane Co., 945 S.W.2d 160, 162 (Tex. App.--San Antonio
1997, writ denied). To consider late-filed evidence, the record must affirmatively demonstrate that
the evidence was filed with leave of court or that the court otherwise accepted or considered it. See
Benchmark Bank v. Crowder, 919 S.W.2d 657, 663 (Tex. 1996) (affidavit that was filed late and
without leave of court could not be considered for summary judgment purposes); Stephens v.
Dolcefino, 126 S.W.3d 120, 133-34 (Tex. App.--Houston [1st Dist.] 2003, pet. denied) (record
affirmatively indicated court's consideration of evidence based on oral ruling in transcript that "the
court will include the evidence offered today in the summary judgment record"); Lection v. Dyll, 65
S.W.3d 696, 702 (Tex. App.--Dallas 2001, pet. denied) (new evidence attached to motion for
reconsideration and/or new trial following summary judgment cannot be considered without leave
of court). 

 Texas law does not allow parties to create fact issues in a motion for new trial or
reconsideration that should have been raised in response to a motion for summary judgment. 
Denman v. Citgo Pipeline Co., 123 S.W.3d 728, 734 (Tex. App.--Texarkana 2003, no pet.)
(appellate court could not consider evidence that was attached to motion for reconsideration of
summary judgment order, which had not been previously filed, because there was no indication in
record that trial court had considered it); Risner v. McDonald's Corp., 18 S.W.3d 903, 909 (Tex.
App.--Beaumont 2000, pet. denied) (party may not present additional evidence in a motion for new
trial unless such evidence is newly discovered); Priesmeyer v. Pacific Sw. Bank, F.S.B., 917 S.W.2d
937, 939 (Tex. App.--Austin 1996, no writ) (evidence attached for first time to motion for new trial
was not proper summary judgment evidence).

 Here, following the court's June 21 final order, Parker moved for a new trial and/or
reconsideration of the summary judgment on July 16. The two motions were filed on the same day
and contained practically identical language. Accordingly, Wella filed a "combined opposition" to
these motions. On August 27, Parker filed a reply to Wella's combined opposition, attaching for the
first time 24 new exhibits. Wella objected to the consideration of this newly filed evidence, and
Parker sought leave of court for its consideration. 

 Nothing in the record reflects that the court granted Parker's request for leave. 
Instead, the record contains a written order stating that, "because [Parker's] motion for new trial has
been overruled by operation of law, [Wella's] objections are overruled as moot." From this we infer
that the trial court denied Parker's request for leave and did not consider the newly filed evidence. 
On appeal, Parker again attempts to rely on these 24 exhibits as support for its claim that at least a
scintilla of evidence exists to prevent summary judgment on each of its claims. Wella urges this
Court to strike the late-filed exhibits and the portions of Parker's brief relying on them. 

 We agree with Wella that these 24 exhibits were not properly before the trial court
for its consideration in connection with the summary judgment because they had not been filed prior
to the signing of the judgment, leave was not granted for their filing, there is no affirmative
indication in the record that the court considered the evidence, (8) and Parker made no claim that the
evidence was newly discovered or gave any other reason for its late filing. See Tex. R. Civ. P.
166a(c); Benchmark, 919 S.W.2d at 663; Stephens, 126 S.W.3d at 133-34; Lection, 65 S.W.3d at
702; Risner, 18 S.W.3d at 909; Priesmeyer, 917 S.W.2d at 939. Therefore, we grant Wella's motion
to strike and do not consider these 24 exhibits or the specific portions of Parker's brief discussing
them. See Denman, 123 S.W.3d at 734; Crossley v. Staley, 988 S.W.2d 791, 794 (Tex.
App.--Amarillo 1999, no pet.) (granting motion "to strike documents outside the record contained
in the appendix to the brief of [appellants], and references in their brief to such documents"). (9) 




Transcript of Parker/Cox Conversation


 The parties also dispute whether the transcript of the telephone conversation recorded
between the Parkers and Scott Cox can be properly considered as summary judgment evidence. As
with the motion to strike, we must decide this issue before turning to the merits of the summary
judgment. The transcript was filed with the court as an exhibit to Parker's conditional summary
judgment response. Wella did not object on the basis of timeliness or authentication of the evidence. 
Rather, Wella objected in writing to the trial court's consideration of this evidence on the grounds
that the transcript (1) was not the best evidence of the recorded conversation, see Tex. R. Evid. 1001-02; (2) was hearsay with respect to Cox's statements, see id. 801; (3) was "speculation within
hearsay" because Cox discussed his assumptions about actions taken by other parties; (4) was not
an admission of a party opponent so as to protect it from the hearsay objection, see id. 801(e)(2),
because Cox worked for Sebastian, not Wella; (5) was incomplete, given the notation at the top of
the transcript that the conversation ensued after completing a discussion of other matters; and (6) was
fraudulently obtained because Parker did not inform Cox that he was recording the conversation for
use in the lawsuit. The record contains no evidence of a ruling on any of these objections, and Wella
does not claim to have obtained a ruling on any of its objections.

 We conclude that the transcript may properly be considered as part of the summary
judgment evidence because each of Wella's objections were to the form of the evidence (rather than
to its substance), and the record reflects no ruling on any of these objections. See Giese v. NCNB
Tex. Forney Banking Ctr., 881 S.W.2d 776, 782 (Tex. App.--Dallas 1994, no writ) (to preserve error
on objection to form of summary judgment evidence, objection must be presented to trial court in
writing, and record must reflect ruling on objection); see also Aust v. Conroe Indep. Sch. Dist., 153
S.W.3d 222, 227 n.2 (Tex. App.--Beaumont 2004, no pet.) (unofficial transcript of recorded
telephone conversation was properly considered as summary judgment evidence because record
contained no evidence that trial court ruled on any of defendant's objections to transcript); Rizkallah
v. Conner, 952 S.W.2d 580, 589 n.7 (Tex. App.--Houston [1st Dist.] 1997, no pet.) (hearsay
objection is to form); Rodriguez v. Ed Hicks Imports, 767 S.W.2d 187, 190 (Tex. App.--Corpus
Christi 1989, no writ) ("not best evidence" objection is to form) (10); cf. Dodge v. Durdin, 187 S.W.3d
523, 532 (Tex. App.--Houston [1st Dist.] 2005, no pet.) (no objection or ruling is necessary to
preserve error on objection to evidence's substantive defect). (11)


Choice of Law


 A final matter that we must decide before turning to the merits of the summary
judgment is what law should govern Parker's claims. The 1996 Distribution Agreement included
a choice-of-law provision stating that "[t]his Agreement shall be construed in accordance with the
laws of the state of New York, without regard to its conflict of laws provisions." Although both
parties presented argument to the trial court concerning the choice-of-law issue, the record does not
reflect a ruling by the trial court as to whether New York or Texas law should apply. 

 Interpreting a similar choice-of-law provision, the supreme court held that 


[t]his provision, by its terms, applies only to the interpretation and enforcement of
the contractual agreement. It does not purport to encompass all disputes between the
parties or to encompass tort claims. The claims that [plaintiff] asserts arise under
Texas tort law. [Plaintiff's] claims do not rise or fall on the "interpretation and
enforcement" of any contractual provision.



Stier v. Reading & Bates Corp., 992 S.W.2d 423, 433 (Tex. 1999); see also Red Roof Inns, Inc. v.
Murat Holdings, L.L.C., No. 05-05-00240-CV, 2006 Tex. App. LEXIS 7576, at *13 (Tex.
App.--Dallas Aug. 25, 2006, no pet. h.) (opinion) ("A choice of law provision in a contract that
applies only to the interpretation and enforcement of the contract does not govern tort claims."). As
in Stier and Red Roof Inns, the choice-of-law provision here relates only to a construction of the
contractual terms. Furthermore, the parties do not dispute that the state with the "most significant
relationship" to Parker's claims is Texas. See Red Roof Inns, 2006 Tex. App. LEXIS 7576, at *14
(law governing substantive claims determined by "most significant relationship" test) (citing
Restatement (Second) of Conflict of Laws §§ 6, 145 (1971)). Thus, we conclude that any necessary
interpretation of the Agreement should be performed using New York law, but the merit of Parker's
claims should be analyzed under Texas law. 

 Having resolved each of the parties' procedural and evidentiary issues, we now turn
to the merits of the summary judgment to determine whether the trial court was correct in concluding
that no genuine issue of material fact remained on any of Parker's pending claims.


Summary Judgment


 After the declaratory judgment issue became moot, Parker's pending claims alleged
that Wella was liable for (1) misappropriation of proprietary, confidential, and trade secret
information; (2) misappropriation of time, labor, skill, and money; (3) unjust enrichment; (4) fraud;
(5) unfair competition; (6) breach of confidential relationship; (7) tortious interference with existing
and prospective business relations; and (8) breach of contract. Wella moved for both traditional and
no-evidence summary judgment, claiming that no genuine issue of material fact remained on any of
Parker's claims because (1) the 1996 Distribution Agreement precludes all claims; (2) none of the
information provided by Parker to Wella can be considered "proprietary," "confidential," or "trade
secrets"; (3) Parker's fraud claim fails as a matter of law because Parker admittedly did not rely on
Wella's statements and the statements were of future intent, not present fact; (4) Wella had no duty
to refrain from selling to former customers of Parker; (5) there is no evidence on at least one element
of each of Parker's claims; and (6) there is no evidence of damages for any of Parker's claims. The
trial court granted summary judgment against Parker on all claims without stating any grounds. 
Parker complains in its fourth issue that the trial court erred in granting summary judgment because
Parker produced more than a scintilla of evidence to support each element of each of its claims.




 Standard of Review


 A no-evidence motion for summary judgment must be granted if, after an adequate
time for discovery, (1) the moving party asserts that there is no evidence of one or more essential
elements of a claim or defense on which an adverse party would have the burden of proof at trial,
and (2) the nonmovant fails to produce more than a scintilla of summary judgment evidence raising
a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). In reviewing a no-evidence summary judgment, we "must examine the entire record in the light most favorable to the
nonmovant, indulging every reasonable inference and resolving any doubts against the motion" to
determine whether more than a scintilla of evidence was presented on the challenged elements of the
nonmovant's claim. City of Keller v. Wilson, 168 S.W.3d 802, 825 (Tex. 2005); Perdue v. Patten
Corp., 142 S.W.3d 596, 604 (Tex. App.--Austin 2004, no pet.).

 In a traditional summary judgment, the movant carries the burden of demonstrating
that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c); American Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997). To
be entitled to traditional summary judgment, a defendant must conclusively negate at least one
essential element of each of the plaintiff's causes of action or conclusively establish each element
of an affirmative defense. Science Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997). 

 In a case where the trial court's judgment does not specify the grounds relied upon
for its ruling, as here, the summary judgment must be affirmed if any of the theories advanced in the
motion is meritorious. Western Invs., Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005); Sheshunoff
v. Sheshunoff, 172 S.W.3d 686, 692 (Tex. App.--Austin 2005, pet. denied). Because the propriety
of a summary judgment is a question of law, we review the trial court's decision de novo. See
Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994). We will consider the merits of Wella's
various grounds to determine whether any of Parker's claims should have survived the summary
judgment. (12)


 Distribution Agreement


 According to Wella, the 1996 Distribution Agreement precludes all of Parker's
claims. Wella argues that it cannot be liable for terminating Parker as a distributor and replacing
Parker with Sebastian's in-house sales team because the Agreement expressly provided Wella with
the right to do so. The Agreement unambiguously stated that each party could "terminate or elect
not to renew the Agreement, without cause, upon sixty (60) days written notice." Wella complied
with this by giving Parker notice on February 1, sixty days prior to the April 2 termination. The
Agreement also provided in paragraph 20 that,


[i]n the event of nonrenewal or termination of this Agreement, Wella reserves the
right to appoint one or more additional distributors of Wella Products with whole or
partial responsibility for the territory set forth in Schedule A on or after the date on
which notice of nonrenewal or termination may be given, as Wella, in its sole
discretion, may determine.


This language gave Wella the right to replace Parker with Sebastian as its distributor for the 65
Central Texas counties in Parker's former market. Thus, based on the Distribution Agreement,
Wella could not be held liable for terminating Parker and switching its Central Texas distribution
efforts to Sebastian. 

 This, however, does not cover the extent of Parker's claims against Wella: Parker
recognizes that Wella had the right to terminate Parker as its distributor and, instead, use Sebastian. 
What Parker complains about is Wella's alleged misuse of Parker's confidential and trade secret
information in the process. More specifically, Parker claims that Wella fraudulently induced Parker
to provide Wella with its confidential customer information for several years during which Wella
knew that Parker would be terminated, yet lied to Parker about the future of their relationship,
promising Parker that it would be rewarded with the Sebastian contract. In addition to fraud, Parker
claims that this constituted misappropriation of its confidential information, as well as the time and
money Parker had invested in building the Wella name and increasing sales for Wella. Parker
alleges that, after the termination, Wella misused this "stolen" information by providing it to
Sebastian, so that it would have an "instant business" in the Central Texas market of Wella
customers. According to Parker, this resulted in Wella being unjustly enriched and constituted unfair
competition and tortious interference with existing and prospective business relations. Further,
Parker urges that Wella had a duty of confidence to not steal and misuse its trade secret information
and that Wella breached that duty.

 Again, Wella responds that each of Parker's claims are precluded by the Agreement,
but focuses here on paragraph 21 of the Agreement, which Wella claims constitutes a full release of
liability. Paragraph 21 stated that


Wella's exercise of its rights under paragraphs 19 and 20 shall not create any
obligation or indebtedness of any kind to Distributor, including without limitation
any claim against Wella for profits or other revenue, charges or damages attributable
to such sales, other than commissions or other compensation expressly due to
Distributor under applicable Wella programs.



As set forth previously, paragraph 20 provided Wella the right to replace Parker with another
distributor in the Central Texas territory and have the new distributor target and sell to the exact
same customers that Parker formerly sold to, as long as the sixty-day notice provision was adhered
to. (13) Nevertheless, paragraph 20 did not provide Wella the right to obtain confidential information
from Parker and then unfairly use it in competition with Parker. 

 Thus, while the plain language of paragraph 21 excuses Parker from any liability
based on its decision to terminate Parker and replace it with another distributor in the same area,
paragraph 21 cannot be construed as a general release of liability for all tort claims arising outside
of the contract. Accordingly, in the event that Parker's evidence was sufficient to create a fact
question about its tort claims, paragraph 21 does not affirmativly negate Wella's potential liability
on such claims. See Rubycz-Boyar v. Mondragon, 790 N.Y.S.2d 266, 267-68 (N.Y. App. Div. 2005)
(release "will not bar subsequent claims unless they are specifically embraced within the release or
fall within the fair import of its terms"); Alcantara v. 603-607 Realty Assocs., 710 N.Y.S.2d 99, 99
(N.Y. App. Div. 2000) ("release may not be read to cover matters which the parties did not desire
or intend to dispose of").

 Therefore, Wella's claim that the Distribution Agreement precludes all of Parker's
claims was not an appropriate ground on which summary judgment could have been granted. 
Having resolved the contract interpretation issue pursuant to New York law, we now turn to an
analysis of Parker's tort claims under Texas law. See Stier, 992 S.W.2d at 433.


 Provision of Trade Secrets or Confidential, Proprietary Information


 Wella asserts that there is no evidence that Parker provided, or that Wella otherwise
obtained or misused, any of Parker's information that could be defined as a "trade secret" or as
confidential, proprietary information. (14) Wella claims that this lack of evidence provided a proper
ground for the trial court to grant summary judgment on each of Parker's claims for which the
provision of such information is a necessary element: misappropriation of proprietary, confidential,
and trade secret information; unjust enrichment; fraud; unfair competition/misappropriation of time,
skill, and money; breach of confidential relationship; and tortious interference with existing and
prospective business relations--i.e., all of Parker's claims except for breach of contract. See Tex.
R. Civ. P. 166a(I).

 Although Parker pled these claims as seven separate causes of action, they all fall
under the umbrella of "unfair competition" regarding the misappropriation of trade secrets. (15) Under
Texas law, a plaintiff can recover for misappropriation of a trade secret by establishing that (1) a
trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship
or was discovered by improper means, (3) the defendant used the trade secret without the plaintiff's
authorization, and (4) the plaintiff suffered damages as a result. (16) IAC, Ltd. v. Bell Helicopter
Textron, Inc., 160 S.W.3d 191, 197 (Tex. App.--Fort Worth 2005, no pet.); Trilogy Software, Inc.
v. Callidus Software, Inc., 143 S.W.3d 452, 463 (Tex. App.--Austin 2004, pet. denied).

 The second element of misappropriation focuses on the improper acquisition of the
trade secret, which can be the basis of a fraud cause of action if the plaintiff establishes that the
defendant employed fraudulent means to obtain the information. See Restatement (Third) of Unfair
Competition § 43 (1995). Parker asserted that Wella fraudulently induced it to provide its
confidential information by misrepresenting to Parker that its information would not be used for any
improper purpose and by falsely promising Parker that it would ultimately be rewarded with the
coveted Sebastian contract while, in reality, Wella intended to terminate Parker and replace it with
Sebastian's distribution team. 

 The third element of misappropriation focuses on the defendant's misuse of the trade
secret. Establishing that the defendant improperly used or disclosed the information can give rise
to causes of action for unfair competition (17) and tortious interference with contractual relationships. 
Also, if it is established that the defendant owed the plaintiff a duty of confidence, then the
defendant's misuse of the trade secret may result in liability for breach of a confidential
relationship. (18) Finally, if the plaintiff can establish that the defendant unfairly benefitted from its
improper acquisition or misuse of the trade secret, then the plaintiff may be able to recover for unjust
enrichment. Parker claimed that, following its termination, Wella used the improperly acquired
confidential information in direct competition with Parker by providing it to the Sebastian
distributors. According to Parker, this also constituted tortious interference with the existing and
prospective sales contracts Parker had or would have with its customers. Parker claimed that
Wella's misuse of its confidential information breached Wella's duty of confidence and, as a result,
unjustly enriched Wella.

 Nonetheless, regarding all of these causes of action, the plaintiff's initial burden is
to demonstrate the existence of a trade secret. Although Wella sought both a traditional and no-evidence summary judgment, we will first review the merits of the summary judgment under the no-evidence standards. See Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004).
Thus--looking at the evidence that was properly before the court for consideration in connection
with the summary judgment--if the record here fails to demonstrate any evidence that trade secret
information was provided by Parker and/or improperly obtained or misused by Wella, then we must
affirm the trial court's grant of summary judgment on each of the seven claims listed above. Parker
claimed that the trade secrets misappropriated by Wella consisted of its customer lists and customer
information.

 "A trade secret may consist of any formula, pattern, device, or compilation of
information which is used in one's business, and which gives him an opportunity to obtain an
advantage over competitors who do not know or use it. It may be a . . . list of customers. . . . It may
[] relate to the sale of goods [such as] . . . a list of specialized customers." Restatement of Tort § 757
(1939). (19) "The subject of a trade secret must be secret." Id. If the information is generally known
or readily ascertainable through independent investigation, then it is not protectable as a trade secret. 
Trilogy Software, 143 S.W.3d at 467. Still, the trade secret protection remains intact if ascertaining
the information would be difficult, costly, or time-consuming. Restatement (Third) of Unfair
Competition § 39 cmt. f. 

 To determine whether information should be classified as a trade secret, we weigh
six factors in the context of the surrounding circumstances: (1) the extent to which the information
is known outside of the business; (2) the extent to which it is known by employees and others
involved in the business; (3) the extent of the measures taken by the business to guard the secrecy
of the information; (4) the value of the information to the business and to its competitors; (5) the
amount of effort or money expended by the business in developing the information; and (6) the ease
or difficulty with which the information could be properly acquired or duplicated by others. In re
Bass, 113 S.W.3d 735, 739-40 (Tex. 2003) (quoting Restatement of Torts § 757 cmt. b).

 Whether a customer list should be considered a trade secret depends on the
circumstances:


[I]f the potential customers for a particular product or service are readily identifiable,
their identities do not constitute a trade secret. On the other hand, specialized
customer information that cannot easily be duplicated . . . or a compilation of specific
information about individual customers, may be sufficiently valuable and secret to
qualify as a trade secret.



Restatement (Third) of Unfair Competition § 42 cmt. f. However, "this does not mean that trade
secret status automatically attaches to any information that a company acquires regarding its
customers; if it did, it would amount to a de facto common law non-compete prohibition." Trilogy
Software, 143 S.W.3d at 466-67; see also Crouch v. Swing Machinery Co., 468 S.W.2d 604, 606
(Tex. App.--San Antonio 1971, no writ) (recognizing that "customer list cases stand on the
periphery of that area of the law which can best be described as 'the trade secret quagmire'"). 
Generally, if the information is a list of wholesale customers that is not contractually protected by
a restrictive covenant, then trade secret status does not attach because former salespeople should not
be prevented from using their skills to sell a particular type of product to a particular market and
because "courts are sensitive to the relative ease of identifying potential customers at the wholesale
user level," such as through trade journals and phone books. Milgrim on Trade Secrets § 1.09[7]
(1997). 

 Here, Parker admits that Wella did not misappropriate its entire customer list and that
Wella did not physically steal any customer information from Parker's records. Rather, as testified
to by Brant Parker, Parker asserts that Wella obtained "byproducts" of its customer information
through the rebate forms Parker provided to Wella in connection with the "market leader" and
"alliance incentive" programs run by Wella. Brant testified that Parker provided such information
for 39 of its most profitable customers through these rebate forms. John Fortunado, Wella's vice
president of direct sales, testified that it was "standard operating procedure" for this information to
be provided in order to justify the amount of the rebate.

 Although Parker claims that "detailed" customer information was provided to Wella,
the rebate forms submitted as summary judgment evidence reveal that Parker supplied only the
customers' names, addresses, phone numbers, contact people, customer code numbers, and amounts
of the exchanges. Wella put forth evidence that such information is readily available in the
marketplace by looking in the phone book, walking into salons to see if Wella products are on the
shelves, and/or contacting the cosmetology licencing board. Eddie Morrison, who works for the
technology department of the Texas Cosmetology Commission (TCC), averred that TCC maintains
lists of all Texas-licensed cosmetologists, salons, and schools, and will provide lists of these entities'
basic information to anyone for a fee. Parker responded that the information it maintains about its
customers is far more detailed and valuable than the lists that are publically available from the TCC. 
Even assuming this is true, however, Parker failed to produce any evidence to show that it provided
or that Wella otherwise obtained such detailed information from Parker. Rather, the record
demonstrates that Parker provided Wella only basic information about its customers--including their
contact information and very limited sales information regarding the rebate purchase. (20)

 Further, Brant acknowledged that Parker submitted this information about a very
small percentage of its customers. While it is undisputed that Parker sold Wella products to
approximately 1,400 customers in the Central Texas area, Brant testified that Parker repeatedly
submitted this information about the same 39 customers. The evidence in the record affirms that the
same 39 customers were repeatedly listed. Thus, although Brant also testified that Parker had
provided "hundreds of lists of customers," it appears that the information supplied was always for
the same 39 customers. (21) 

 Moreover, Fortunado expressly denied that Wella misused any customer information
that it had obtained from Parker. First, Fortunado explained that Wella's decision to merge its
distribution efforts with Sebastian's was not intended to harm Parker. Rather, it was simply the most
logical option because the sales "infrastructure [was already] existing in the marketplace with the
Sebastian brand"; there were already "Sebastian salesmen, . . . warehousing, offices, education
center, et cetera." Fortunado also averred that, as part of the merger, Wella relocated its offices from
New Jersey to California and, as part of that move, Wella "discarded old forms including its
distributor rebate forms." Finally, Fortunado testified that, after Parker's termination, when the
Sebastian distributors began selling Wella products in Parker's former market, the Sebastian team
did "absolutely not" have "a list of sales targets or names to go contact" and did not use any of the
information that had been provided on Parker's rebate forms in order to sell Wella products in the
Central Texas area. 

 Parker failed to controvert Fortunado's testimony. Instead, when Riley Parker was
asked whether any "Sebastian salespeople [] have used any of Parker's confidential customer
information," Riley responded, "I don't know." Brant Parker admitted that he had no actual
knowledge of whether Wella had collected the information from Parker's rebate forms and used it
to target customers and/or whether Wella had provided any of the customer information to the
Sebastian sales team. Brant "believed" Wella had misused the information on the basis that, soon
after the termination, Sebastian salespeople set up meetings with some of Parker's former customers. 
Yet, documents produced by Wella demonstrated that all but four of the customers identified by
Parker were also Sebastian customers prior to the transition of distributors. And Brant agreed in his
deposition that, prior to Parker's termination, Sebastian salespeople visited salons in the same
territory covered by Parker for its own sales purposes.

 Based on this record, we conclude that Parker failed to put forth a scintilla of
evidence to demonstrate that Wella improperly obtained or misused any of its trade secret
information. See IAC, Ltd., 160 S.W.3d at 197. The basic customer contact and limited sales
information that Parker provided about 39 of its customers is "information that is generally known
or readily ascertainable through independent investigation" and, thus, is not entitled to trade secret
protection. See Trilogy Software, 143 S.W.3d at 467. The six-factor test set forth in the Restatement
of Torts confirms this conclusion because the bulk of the information provided on the rebate forms
about Parker's 39 professional salon and cosmetology customers--i.e., their names, addresses,
telephone numbers, and contact people--is easily ascertainable by those outside the business by
contacting TCC or looking in the phone book, and the majority of this information is already known
by competitors inside the industry. Thus, because it is relatively simple and inexpensive to acquire
or duplicate this basic information, it does not carry a high value. See In re Bass, 113 S.W.3d at 739-40. Moreover, nothing in the Distribution Agreement addressed the confidentiality of such
information; thus, the lists provided here were more akin to a "list of wholesale customers that is not
protected by a restrictive covenant" than a "specialized list of customers." See Milgrim on Trade
Secrets § 1.09[7]. 

 In response, Parker emphasizes that it spent decades and a significant amount of
money developing its customer information and its sales relationships with customers. As we have
stated, we believe that this is true and that such information is the type of specialized, confidential
information entitled to trade secret protection. See Restatement (Third) of Unfair Competition § 42
cmt. f. Nevertheless, there is no evidence that Wella improperly obtained or misused any such
information. 

 Instead, the record reflects that the only customer information obtained by Wella was
that listed on the rebate forms, and this is simply not the type of information entitled to trade secret
protection. See Milgrim on Trade Secrets § 1.09[7]. Thus, Parker failed to put forth a scintilla of
evidence to show that Wella fraudulently induced Parker to provide trade secret information. See
Tex. R. Civ. P. 166a(I). And even if this information was classified as trade secrets, none of the
evidence properly presented for the trial court's summary judgment consideration shows that Wella
misused any of the information provided on Parker's rebate forms. Accordingly, Parker failed to
create a genuine issue of material fact about whether Wella misappropriated any of Parker's
proprietary, confidential, or trade secret information; was unjustly enriched; unfairly competed with
Parker or misappropriated Parker's time, skill, and money; breached its duty of confidence toward
Parker; or tortiously interfered with any of Parker's existing or prospective contractual relationships. 
Thus, the lack of evidence regarding trade secrets was a proper ground for the trial court to grant
summary judgment on all of Parker's claims except for breach of contract. See id.


 Breach of Contract


 Beyond Parker's tort claims related to the misappropriation of trade secrets, the only
remaining cause of action pled in Parker's original petition is breach of contract. The breach of
contract alleged by Parker was not that Wella somehow breached the Distribution Agreement by
terminating Parker and replacing it with Sebastian. As stated, Parker acknowledges that Wella had
a right to do so as long as it complied with the sixty-day notice provision. Rather, the basis of
Parker's breach of contract claim was that Wella failed to reimburse it for certain products. Parker
has waived this claim by failing to address it in its conditional or supplemental responses to Wella's
summary judgment motion, its appellate brief, or its reply brief, and by otherwise presenting no
evidence about the allegedly owed reimbursements. See Tex. R. Civ. P. 166a(i); Tex. R. App. P.
38.1. Thus, the trial court properly granted summary judgment in favor of Wella on Parker's breach
of contract claim.


 

 Summary Judgment Conclusion


 Although the Distribution Agreement did not preclude Parker from bringing its claims
against Wella, Parker's tort claims fail based on the lack of evidence regarding trade secrets, and its
contract claim was waived. Accordingly, the trial court correctly granted summary judgment in favor
of Wella. Parker's fourth issue is overruled. 


CONCLUSION

 Having overruled each of Parker's four issues and granted Wella's motion to strike,
we affirm the trial court's final summary judgment.






 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear: Opinion by Chief Justice Law; 

 Concurring Opinion by Justice Patterson


Affirmed


Filed: October 11, 2006
1. The business continues to be run by members of the Parker family. Brant Parker is the
President, his wife Kristen is the Vice-President of Sales, his father Riley is the CEO, and his mother
Carol is the Senior Vice President. Throughout this opinion we will refer to the business as
"Parker," and to the family officers by either their first or their full names.
2. As a basis for arguing that a live controversy remained on this issue, Parker points to the
fact that the order denying Wella's motion to dismiss did not address the attorney's fees sought by
Parker in connection with the declaratory relief. Parker, however, was the party responsible for
drafting the order and, thus, for failing to include language awarding attorney's fees. And Parker
never again raised the issue of attorney's fees in connection with its mooted request for declaratory
relief until after the final order was entered. At that point, Parker brought the issue to the court's
attention in one sentence contained in its motions for new trial and for reconsideration. The trial
court allowed each of these to be overruled by operation of law, thereby affirming its intent that the
June 21 order be treated as a final order. In any event, when the underlying controversy became
moot, there was no longer a need for a declaratory judgment; because a declaratory judgment may
not be used solely as a vehicle to obtain attorney's fees and is inappropriate if it will serve no useful
purpose, Parker had no right to an award of attorney's fees under the Declaratory Judgment Act. See
Texas State Bd. of Plumbing Exam'rs v. Associated Plumbing-Heating-Cooling Contractors of Tex.,
Inc., 31 S.W.3d 750, 753 (Tex. App.--Austin 2000, pet. dism'd by agr.) 
3. Cox was actually a former officer of Sebastian, not Wella.
4. In July 2003, Parker had initially noticed its intent to depose Webb. Yet, Parker voluntarily
withdrew this notice in August 2003 pursuant to a Rule 11 Agreement entered by the parties and did
not take further action on scheduling Webb's deposition until April 29, 2004. 
5. Parker sought the depositions of each of the following Wella witnesses at that time: Terry
Webb, Andrew Biazis, Scott Cox, Theresa Wheeler, and Thomas Habrock.
6. In connection with this issue, Parker and Wella also dispute whether a subpoena was
required for Webb's deposition. Because our holding does not depend on whether or not a subpoena
was required, we do not address this dispute.
7. Moreover, even though the court permitted Parker to supplement its response with
additional evidence on June 17 (more than a week after Webb's and Cox's depositions had been
taken), Parker chose not to include any testimony from these depositions in its supplement.
8. Parker claims that a letter sent from the court to the parties demonstrates that the court
considered the late-filed evidence. The letter, however, does not appear in the record. Instead, it is
attached to Parker's response to Wella's motion to strike. Documents attached as appendices to
appellate briefs are not formally included in the record on appeal and, therefore, will not be
considered on appeal. Cantu v. Horany, 195 S.W.3d 867, 870 (Tex. App.--Dallas 2006, no pet.);
Nguyen v. Intertex, Inc., 93 S.W.3d 288, 293 (Tex. App.--Houston [14th Dist.] 2002, no pet.). 
Furthermore, Parker's response is not verified. See Tex. R. App. P. 10.2(a) (motion that depends
on facts not in record must be verified). 
9. Parker urges that, if anything, only the late-filed evidence, and not the related portions of
its brief should be struck. As to not deprive Parker of any equity in our review, we consider every
portion of its brief except for those directly discussing the evidence in the stricken exhibits. See
Carlisle v. Philip Morris, 805 S.W.2d 498, 501 (Tex. App.--Austin 1992, writ denied) (in addition
to striking evidence outside the record, court refused to consider "offending portion of [appellants']
brief" that relied on such evidence). Stated another way, the portions of its brief relying solely on
the stricken exhibits are without merit because there is no evidence in the record to support them. 
See Tex. R. App. P. 38.1(h) (argument must be supported with appropriate citations to record);
McMahan v. Greenwood, 108 S.W.3d 467, 483 (Tex. App.--Houston [14th Dist.] 2003, pet. denied)
(because late-filed evidence could not be considered, "there [was] no evidence in the summary
judgment record to raise a fact issue"). 
10. Although our research revealed no case discussing whether objections to summary
judgment evidence as "incomplete" or "fraudulently obtained" are to its form or substance, we
conclude that they are objections to form because they do not create a deficiency in the actual,
substantive claim of the party, such as an objection to the conclusory nature of an affidavit or to the
non-existence of proof. See Dodge v. Durdin, 187 S.W.3d 523, 532 (Tex. App.--Houston [1st Dist.]
2005, no pet.) (conclusory statements in affidavit present substantive defect); Galindo v. Dean, 69
S.W.3d 623, 627 (Tex. App.--Eastland 2002, no pet.) (reliance on facts contained only in missing
exhibit is substantive defect).
11. In any event, having reviewed the transcript in full, we find its primary content to provide
evidence that Wella intended to terminate Parker as early as 1997, which is contrary to Wella's claim
that the decision was not made until 2001. However, Cox makes no statement in the transcript that
provides evidence of Wella obtaining or misusing Parker's trade secrets--the basis on which our
resolution of the summary judgment turns. Thus, even taking all statements in the transcript as true,
it does not affect our holding. 

12. As an initial matter, Wella asserts on appeal that an independent ground for affirming the
summary judgment is that, while Wella's motion was submitted on behalf of all three defendants
(Wella, German, and Crawford), Parker's response only addressed Wella. We disagree. The first
page of Parker's response expressly stated that, thereafter, it would refer to all three defendants
collectively as "Wella." This was sufficient for Parker's response to cover its claims against all
defendants, especially in light of the fact that Wella itself referred to all defendants collectively as
"Wella" in many of its pleadings. 
13. Paragraph 19, which is not relevant to the issues here, discussed the parties' rights to sell
to hair-styling schools. Accordingly, we will discuss paragraph 21 only in the context of paragraph
20, without regard to paragraph 19.
14. The parties alternatively used each of these terms at various times. For ease, we will refer
to such information simply as "trade secrets."
15. See James E. Hudson, III, A Survey of the Texas Unfair-Competition Tort of Common-Law
Misappropriation, 50 Baylor L. Rev. 921, 923 (1998) ("unfair competition is the umbrella for all
statutory and nonstatutory causes of action arising out of business conduct which is contrary to
honest practice in industrial or commercial matters. [Independent causes of action exist] within the
broad scope of unfair competition."); see also Restatement (Third) of Unfair Competition § 40 cmt.
a (1995) ("however denominated," unfair competition includes torts for misappropriation,
infringement, unjust enrichment, and breach of confidence, but not breach of contract).
16. Unlike this common-law test, which requires proof of both the second and third elements,
the Restatement (Third) of Unfair Competition states that "improper acquisition" and "improper use
or disclosure" of the trade secret are independently actionable torts. See id. § 40 & cmt. b-c, § 43
(1995). It is not clear, however, if Texas expressly follows this Restatement. Although in 2003, the
supreme court acknowledged and agreed with portions of the Restatement (Third) of Unfair
Competition, it nevertheless used the six-factor test set forth in the Restatement of Torts § 757 cmt.
b (1939) to define a trade secret. See In re Bass, 113 S.W.3d 735, 739-42 (Tex. 2003).
17. Specifically, the elements of this cause of action have been defined as (1) the creation of
plaintiff's product (i.e., the trade secret information) through extensive time, labor, skill, and money;
(2) the defendant's use of that product in competition with the plaintiff, thereby gaining a special
advantage in that competition (i.e., a "free ride") because defendant is burdened with little or none
of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff. Synercom Tech.,
Inc. v. University Computing Co., 474 F. Supp. 37, 39 (N.D. Tex. 1979); United States Sporting
Prods., Inc. v. Johnny Stewart Game Calls, Inc., 865 S.W.2d 214, 218 (Tex. App.--Waco 1993, writ
denied). Because Parker's claim for "misappropriation of time, labor, skill, and money" is
encompassed within this definition, if summary judgment was proper on its "unfair competition"
claim, then it was also proper on this claim. In any event, we find no basis to reverse the court's
grant of summary judgment as to Parker's claim for "misappropriation of time, labor, skill, and
money" because Parker failed to address this claim in either its original or reply briefs to this Court. 
See Tex. R. App. P. 38.1 (brief must contain clear and concise argument for contentions made).
18. The Restatement (Third) of Unfair Competition § 41 states that a "duty of confidence"
exists when "(a) the person made an express promise of confidentiality prior to the disclosure of the
trade secret; or (b) the trade secret was disclosed to the person under circumstances in which the
relationship between the parties to the disclosure or the other facts surrounding the disclosure justify
the conclusions that, at the time of the disclosure, (1) the person knew or had reason to know that
the disclosure was intended to be in confidence, and (2) the other party to the disclosure was
reasonable in inferring that the person consented to an obligation of confidentiality." Although
Wella asserted as an additional ground for summary judgment that it owed no such duty, we assume
without deciding that a duty of confidentiality existed and ask, even if Wella owed such a duty, was
there any evidence in the record that Wella misappropriated Parker's trade secret information? 
19. Texas courts continue to follow the definition of trade secrets, as well as the six factors
used to identify a trade secret, set forth in section 757 of the original Restatement of Torts, despite
the facts that this section was omitted from the Restatement (Second) of Torts, that the Restatement
(Third) of Unfair Competition provides a slightly altered definition of trade secrets, and that many
states--not including Texas--have adopted the Uniform Trade Secrets Act. See In re Bass, 113
S.W.3d at 739-42 (discussing history and concluding that section 757 remains instructive in Texas);
Trilogy Software, Inc. v. Callidus Software, Inc., 143 S.W.3d 452, 463 (Tex. App.--Austin 2004,
pet. denied) (applying section 757); American Derringer Corp. v. Bond, 924 S.W.2d 773, 776 n.1
(Tex. App.--Waco 1996, no writ) (even after adoption of Restatement (Third) of Unfair
Competition, "Texas courts have generally followed the principles of the original Restatement");
Milgrim on Trade Secrets §§ 1.01[2], 1.02 (1997) (section 757 "continues to have vitality and
interpretive force" as the "uniformly recognized trade-secret definition").
20. Beyond the actual rebate forms, Wella officer Thomas Habrock testified that he was
unaware of Parker ever providing Wella information about its customers' buying habits or its
potential customers, and Wella officer Rolando Reyes testified that the only customer information
he ever obtained from Parker was that provided on the rebate forms.
21. We note that the record reflects that Parker also provided sales data to Wella in response
to a 1995 request for all distributors to share such information so that Wella could produce a
nationwide market report. Yet, Parker never relies on this as evidence of trade secrets provided to
Wella. In any event, this information was provided in 1995--prior to the time Wella allegedly had
decided to terminate Parker. Thus, in light of Parker's claim that Wella concealed its intention to
terminate Parker from 1997 until 2001 in order to fraudulently induce Parker to reveal its customer
information during that time, the fact that this information was provided in 1995 provides no
evidence to support Parker's "fraudulent inducement" claim. Also, there is no evidence to show, and
Parker does not claim, that Wella misused any of the information provided in response to the 1995
request. Rather, it appears from the record that Wella used the data only to compile regional
statistics with the stated purpose of providing distributors "insight into the current trends of the
beauty industry," as well as to "set forth the platform from which we will continue to increase and
measure market penetration."